# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MATTHEW HALE,** | ) | |
| **Defendant-Movant,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:08 CV 94** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff-Respondent.** | ) | |

## OPINION AND ORDER

This matter is before the court on defendant-movant Matthew Hale's motion pursuant to 28 U.S.C. § 2255 (DE #1), fully-briefed by his brief in support (DE #18) and addendum (DE #8-3), the United States of America's (hereinafter, "government") amended response (DE #30), and Hale's reply brief (DE #36) and exhibits thereto (DE #36-1). In addition, Hale obtained leave to file a supplemental brief amending one of his arguments (DE #37), to which the government filed a responsive brief (DE #42) and Hale a reply brief. (DE #46). Hale also recently filed a supplemental notice. (DE #48.) Because this court's review of the parties' briefs, supporting documentation and the record of prior proceedings in this action allows the court to determine that the facts Hale has alleged, even if proven, would not entitle him to relief, an evidentiary hearing is not required. 28 U.S.C. § 2255(b); *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001); *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994).

Hale was the leader, with the title "Pontifex Maximus," of an organization known as the World Church of the Creator (hereinafter, "WCOTC"). The WCOTC was involved in civil trademark litigation with another organization using the term "Church

of the Creator," see *TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator*, 297 F.3d 662 (7th Cir. 2002), being presided over by United States District Judge Joan H. Lefkow. Hale was indicted for, and stood trial on, two counts of solicitation to commit a crime of violence—the murder of Judge Lefkow—in violation of 18 U.S.C. § 373, and three counts of obstruction of justice in violation of 18 U.S.C. § 1503. On April 26, 2004, the jury found him not guilty of one of the solicitation counts, and guilty of the remaining four counts. On November 10, 2004, the court partially granted Hale's motion for a judgment of acquittal pursuant to FED. R. CRIM. P. 29(c), vacating the verdict on one of the obstruction of justice counts. On April 6, 2005, the court sentenced Hale to consecutive terms of imprisonment to arrive at a total term of imprisonment of 480 months. Hale took a direct appeal, and his convictions and sentence were affirmed. *United States v. Hale*, 448 F.3d 971 (7th Cir. 2006). His petition for *certiorari* was denied on October 1, 2007. *Hale v. United States*, 549 U.S. 1158 (2007). His § 2255 motion was timely filed within one year thereafter.

A § 2255 motion allows a person in federal custody to attack his or her sentence on constitutional grounds, because it is otherwise illegal, or because the court that imposed it was without jurisdiction. Hale raises two grounds which he believes require that his conviction be vacated: violation of his right under the Sixth Amendment to the United States Constitution to effective counsel; and violation of his right under the Fifth Amendment, and under FED. R. CRIM. P. 43(a), to be present at every critical stage of his trial.

**I. Ineffective assistance of counsel**

The test to determine whether a defendant's right to assistance of counsel as provided by the Sixth Amendment has been violated is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* test has two prongs. First, the "defendant must show that the performance of counsel fell outside the 'range of competence demanded of attorneys in criminal cases'–i.e., that it 'fell below an objective standard of reasonableness.'" *Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687). There is a strong presumption of competence. *Id.*

Second, the defendant must show that he suffered prejudice as a result of his counsel's ineffectiveness. *Id.* In other words, the defendant must demonstrate "a reasonable probability that, *but for* counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The court should deny an ineffective assistance of counsel claim if the defendant has made an insufficient showing on either prong. *Strickland*, 466 U.S. at 697. The court may assess the prongs in whichever order it chooses. *Id.* Additionally, while Hale makes multiple allegations of error to support his claim that his counsel was constitutionally ineffective, it must be kept in mind that:

> [I]neffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief.

*Peoples v. United States,* 403 F.3d 844, 848 (7th Cir. 2005) (citing *Bell v. Cone,* 535 U.S. 685, 697 (2002); *Strickland*, 466 U.S. at 690; *Holman v. Gilmore,* 126 F.3d 876, 881-84 (7th Cir. 1997)).

*A. Overview of Hale's Ineffective-Assistance Claim*

With this in mind, although Hale has broken his argument into nine "instances" of ineffective assistance (nearly every instance consisting of several different allegations of error), one overarching theme permeates almost every allegation in one way or another. This makes an overall comment on that theme appropriate, that is, a look at the forest before getting lost in the trees. The theme, stated as the first "instance" of ineffective assistance (with six sub-allegations of error), is that, with respect to Hale's conviction on the solicitation count in violation of 18 U.S.C. 373, his counsel's performance fell below the level of competence required because he pursued the wrong defense, and not Hale's "best" and "true" defense. Hale argues that if his attorney had pursued Hale's "actual, *bona fide* defense which was much stronger," taking that course "would likely have resulted in Mr. Hale's exoneration." (DE #18 at 13.)[1]

This argument, to be blunt, is preposterous. First, because it is built entirely on the incorrect premise that if his attorney failed to pursue Hale's "best" defense, that

---

[1] Although it flouts Bluebook convention, the advent of the court's electronic filing system (CM/ECF) makes it most easy to pinpoint references to documents in the file by citing their docket number and page number *assigned by the CM/ECF system*, printed in blue at the top of every page image, not the physical page number found on the document itself. The court will use this method, and to identify documents filed in the criminal case file, the citation format will be "1:03CR11 DE #x at y."

automatically equals ineffective assistance of counsel. That premise finds no support in the law governing ineffective-assistance claims. As long as Hale's attorney utilized a defense strategy that was not so misguided that it fell outside the wide range of professional competence, Hale received constitutionally-effective representation. As the Court of Appeals has remarked, "the Constitution does not ensure that every defendant receives the benefit of superior advocacy—how could it, given that half of all lawyers are below average?" *Castellanos v. United States*, 26 F.3d 717, 719 (7th Cir. 1994).

Second, and more compelling, it is the court's view that Hale's attorney in fact did utilize the best defense, or at least one better than the one he proposes now. But even if the court's opinion in this regard is incorrect, and Hale's opinion more accurate, clearly the defense pursued was not so beyond the pale that it fell outside the wide range of professional competence. Comparing the essence of the defense that was used to the defense Hale believes should have been used makes this plain.

The defense Hale's attorney used, briefly stated, was that the evidence showed that Hale lacked the intent to solicit a crime of violence, instead it was the government's informant, Tony Evola, who proposed the crime and solicited Hale's participation through repeated entreaties. Hale never agreed to the plan or, if he did, he did so only because his will was overborne by Evola's persuasion. There was sufficient evidence to support this defense, and the court gave the jury an instruction on entrapment as final instruction number 20. (1:03CR11 DE #160 at 23.)

Now, Hale argues that pursuing an entrapment defense was not a strategic choice, but instead an error that resulted from his attorney's[2] failure to understand the basic facts of his case. Hale argues that, had his attorney understood the facts, counsel would have realized that the evidence clearly showed that Hale believed he and Evola were discussing the murder of a lawyer named James Amend, not Judge Lefkow, and that once Hale realized that Evola actually meant Judge Lefkow, Hale "categorically rejected" the plan. (DE #18 at 2; DE #8-3 at 9 ¶ 8, 10-11 ¶ 13.) In other words, Hale is contending that it would have been a better defense for his attorney to admit that Hale wanted Evola to murder *someone*, essentially conceding the most difficult material elements of the crime—Hale's intent that Evola commit a felony involving physical force, and his solicitation of Evola to commit that felony—and hinging his entire defense on his supposed misunderstanding of who that someone was. Bluntly put, Hale's "bona fide" defense, as he describes it now, is that the jury should have been shown that he wanted Evola to murder lawyer James Amend, not Judge Lefkow.

Based on the strength of the government's case, however, the court has no doubt that, had this defense been pursued, Hale would nevertheless have been found guilty and would be arguing now that his attorney was ineffective for admitting his murderous intent instead of denying that intent and pursuing an entrapment defense. Viewing the argument in these simple terms—that it would have been a better defense

---

[2] Hale was represented by co-counsel Thomas Durkin and Patrick Blegen. For convenience, however, the court will most often use a singular reference to counsel in this order.

to admit that Hale and Evola were agreeing to the murder of Amend, than to admit that

Judge Lefkow was being discussed, but it was Evola who solicited Hale—is to see how

meritless it is to claim that the defense chosen was so outside the realm of competence

as to be ineffective. Perhaps this is why Hale doesn't argue that the defense used was a

strategic choice at all, instead contending that his attorney accepted that Judge Lefkow

was the object of the plot, using the wrong defense because he didn't fully investigate

and understand the case and so did not understand that the alternate defense existed.[3]

To be absolutely clear, the court rejects Hale's argument that his defense

counsel's choice of defense was an ignorant blunder, and not a strategic choice.

According to Hale, he plainly and repeatedly informed his counsel that he initially

thought that he and Evola were discussing Amend, and not Judge Lefkow, and of

evidence that would support this theory, but his attorney refused to investigate,

develop and use that defense. (DE #8-3 at 9-10 ¶¶ 8, 11, 12.) Thus, by definition, his

attorney did make a choice as to what defense to use. The court must view that choice

with great deference, and to demonstrate ineffective assistance, Hale must overcome a

presumption that, under all of the circumstances, his attorney's choice "might be

considered a sound trial strategy." *Strickland*, 466 U.S. at 690 (internal quotation marks

and citation omitted); *Valenzuela v. United States*, 261 F.3d 694 (7th Cir. 2001). It is hard

---

[3] Hale himself shows this not to be the case. His affidavit in support of his motion explains how he discussed the facts supporting this defense with both of his defense counsel. (DE #8-3 at 9-10 ¶¶ 8, 11, 12.) Obviously, defense counsel didn't believe this defense option to be the best strategy to use at trial.

to imagine any set of circumstances where admitting solicitation to commit murder, and

arguing about the identity of the victim, would be such a better strategy that it would

make a decision to contest the intent element—in a case with enough evidence to

support an entrapment instruction[4]—an unsound strategy. Hale has certainly not

persuaded the court that this is that case.

It should be noted that the court arrived at its understanding of Hale's

argument—that he would have admitted his solicitation of Evola to murder

Amend—*before* the court read the government's response, in which the government

reaches the same conclusion. In his reply brief, Hale vigorously protests this conclusion,

arguing that "counsel would not have been forced to concede that Mr. Hale approved of

or solicited Amend's murder." (DE #at 1.) Whatever the nuances of this argument may

be, the court fails to appreciate them. The point cannot be made clearly enough that

Hale's original argument is based on the idea that he would have admitted his

solicitation of Evola to murder Amend, so that his later comments could be cast as a

rejection of the "new" plan to murder Judge Lefkow. As stated in his opening brief:

> [T]he jury found Mr. Hale guilty without the benefit of evidence proving
> . . . that Mr. Hale thought Evola was saying "consider it done" to lawyer
> Amend's murder, that the December 9, 2002 email told Mr. Hale that

---

[4] In his reply brief Hale argues that the court, in its order denying his post-trial
motion for a judgment of acquittal or new trial, has already found that "no reasonable
jury could have found that Mr. Hale had been entrapped," logically meaning that
choosing to use that defense was unreasonable. (DE #36 at 4.) The court made no such
finding. The court's finding was that Hale's argument that no reasonable jury could
have found that he was not entrapped (i.e., that *any* reasonable jury would have found
entrapment) was, based on the evidence, incorrect. (1:03CR11 DE 249 at 18-20.)

> Evola had **changed** his target from a "***Jew*** rat" (lawyer Amend) to a
> "***female*** rat" (Judge Lefkow); and hence when Mr. Hale repeatedly said on
> December 17, 2002, that he could not be a party to Evola's plot against
> Judge Lefkow, he was absolutely rejecting Evola's new proposal to kill
> Judge Lefkow rather than indulging in "plausible deniability."

(DE #18 at 14.) All that the argument in Hale's reply does—for example, he argues that

he would have testified that his response "good" when Evola said "consider it done" as

to Judge Lefkow's murder was merely a facetious remark (DE #36 at 2)—is split hairs

and show how difficult his supposed "best" defense would have been, and so

demonstrate why his counsel's decision to use a different defense strategy was not

outside the acceptable boundaries of professional competence.[5]

Finally, even were the court to accept Hale's argument that the defense used was

a blind error, not a strategic choice, or was such a poor strategy as to fall below the

minimum threshold of professional competence, and proceed to analyze Hale's claim

solely in terms of whether he suffered prejudice, his ineffective assistance claim fails

that prong of the test as well. This is not only because of the strength of the evidence

against Hale, but also because the defense he now argues was stronger is at best weakly

---

[5] Hale's "good" remark occurs during a conversation recorded on December 5, 2002. Hale also argues that during this very conversation he told Evola that he (Hale) was "gonna fight within the law." DE #36 at 2). That comment, however, came after Evola asked if "we gonna exterminate the rat?" and Hale responded that while he himself was going to "fight within the law," if Evola wished to "do anything" himself, he could, "[s]o that makes it clear." That is when Evola responds "consider it done" and Hale says "good." (1:03CR11 DE 249 at 12.) Moments later, Hale tells Evola that if "something" were to happen to Hale, Evola should be sure to "make sure that . . . the world knows about it in a very strong way" and that he Evola should use his "imagination" as to what that means. (*Id*. at 13.) This entire conversation, in context, shows what a difficult sale Hale's supposed "best" defense would have been.

supported by the evidence, and the arguments Hale believes his attorney improperly failed to pursue would have played directly into the strength of the government's case.

For example, although Hale argues now that, once he understood that Evola was proposing the murder of Judge Lefkow, he "categorically rejected" the plan (DE #18 at 14), this is a classic attempt to make a silk purse from a sow's ear. Nowhere on the audio recordings or e-mail messages admitted into evidence does Hale tell Evola not to commit such an atrocious crime. Instead, after Evola made it clear that he was discussing the murder of Judge Lefkow,[6] Hale simply stated that he wouldn't be a party to the scheme, told Evola that "whatever a person does is according to the dictates of their own conscience," and compared himself to the fictional POW camp guard Sergeant Schultz, known for comedically exclaiming "I know nothing." (1:03CR11 DE 249 at 16-17.)

The government's theory was that Hale encouraged his acolytes to commit violent acts while at the same time denying personal involvement to create "plausible deniability." This conversation is entirely consistent with that theory, and, had Hale conceded that he was soliciting Evola to murder someone other than Judge Lefkow, the government's case would have been made easier, leaving it necessary to prove only the proposed victim's identity. Even if Hale's defense counsel had done everything which Hale now believes was warranted, the court believes that the evidence—in particular

---

[6] This occurs in a tape recording of a conversation occurring on December 17, 2002.

the key conversation Hale focuses on—still strongly indicates that Hale understood Evola's target from the beginning to be Judge Lefkow, and Hale therefore would still have been found guilty.[7] In short, Hale's arguments concerning the defense he believes should have been used do not "undermine confidence in the outcome" by showing a reasonable probability that the result of the proceeding would have been different, which means prejudice did not result. *Strickland*, 466 U.S. at 694.

This conclusion means that if the court were to proceed in the narrowest fashion possible, it is not necessary to examine in detail the sub-arguments Hale makes as to why his attorney's choice of defense was improper. (In fact, the analysis of the entire ineffective-assistance could almost stop here, because Hale's argument about the defense strategy that should have been used factor into most of his other arguments.) Nevertheless, in the interest of being thorough and because doing so makes it even clearer that Hale's proposed "wrong target" defense does not show that his attorney pursued a defense so flawed as to be ineffective (that is, looking at the individual trees doesn't change the court's opinion of the forest), the court will briefly address each of the individual issues Hale raises in support of that aspect of his ineffective assistance claim, along with its discussion of the remainder of his ineffective-assistance arguments.

---

[7] The court has repeatedly explained in prior orders in this case why it disagrees with the theory Hale advances again now, that the surreptitiously-recorded conversations, if properly transcribed, show that he and Evola were discussing Amend, not Judge Lefkow. See, *e.g.*, 1:03CR11 DE 249 at 15-17; 1:03CR11 DE 250-1 at 4-5.

*B. Hale's Specific "Instances" of Ineffective Assistance*

In the analysis that follows, the court tracks Hale's organization of his ineffective assistance claim into nine "instances" of ineffective assistance of counsel, many of those instances being composed of several alleged lapses in counsel's performance. Thus, each of the section headings below is identical to the one used by Hale in his supporting memorandum, enclosing in brackets the numeric designation where it is found in Hale's memorandum, for easy reference to Hale's brief in support. As a result, however, there is some redundancy, because many of Hale's arguments themselves are overlapping. This is not surprising, really, since ineffective assistance of counsel is a single ground for relief, no matter how many mistakes are made, and it is the attorney's overall performance that must be considered. *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005).

*1. "Failure to Present the Correct Theory of Defense" [Hale's II.B.1]*

First, Hale outlines the reasons why the evidence demonstrates: 1) when Evola initially met with him on December 5, 2002, to propose "exterminating" the "Jew rat," Hale thought that they were discussing lawyer Amend; 2) only after Evola mentioned a "femala rat" in a December 9, 2002, e-mail message did Hale understand that Evola had "switched" the target of the plan to Judge Lefkow; and 3) Hale then met with Evola on December 17, 2002, and categorically rejected the "new plan," by stating he could not "be a party to such a thing." (DE #18 at 14-16.) Hale's argument is that his attorney failed to present additional evidence which would have proved  Hale's original

understanding that Evola was proposing the "extermination" of lawyer Amend, and that that failure had the consequence of allowing the jury to accept the government's theory that the December 17, 2002, conversation with Evola was Hale's attempt to engage in "plausible deniability," rather than understanding that Hale was rejecting outright the "new" plan directed at Judge Lefkow.

Before addressing Hale's elaboration of all of the subparts of this argument, a few overall observations are important. First, Hale has already made essentially this same argument in post-trial motions (1:03CR11 DE ## 219; 221; 233; 245); and the court has already painstakingly explained why, when the evidence is viewed as a whole, the most plausible interpretation of the initial conversation between Hale and Evola is that Hale understood Evola to be referring to the "extermination" of Judge Lefkow. (1:03CR11 DE ## 244 at 4 n.6; 249 at 15 n. 16; 250-1 at 4-5.) The court incorporates all of its prior explanation and analysis here by reference, and nothing Hale discusses now, concerning the additional evidence he asserts that his attorney failed to offer, persuades the court that the evidence should be viewed differently.

Second is a point which the court has not clearly made until now, and which bolsters the court's view that the most plausible interpretation of the first conversation between Evola and Hale is that both participants understood it to concern Judge Lefkow. Considering that Hale's assertion is that he "categorically rejected" the new plan after Evola supposedly "switched" the target, it is odd that Hale never expressed disappointment at Evola's abandonment of the existing plan, surprise, shock or dismay:

*i.e.*, he never said anything to Evola along the lines of "wait a minute, I thought we were talking about Amend, let's get back to that plan," or "are you crazy? I don't want a federal judge murdered!"[8] In his reply brief Hale argues that it was unnecessary for him to "correct" Evola, because he hadn't solicited Evola to do anything in the first place. (DE #36 at 2.) As has been explained previously and again herein, while that might be a reasonable view of the evidence, it is not the only reasonable view, and is one the jury rejected.

Third, and despite Hale's reply argument to the contrary, arguing that Hale understood Evola to be talking about attorney Amend, but called the plan off when it switched to Judge Lefkow, would have effectively amounted to a concession that Hale had solicited Evola to murder Amend. Thus, his entire defense would have hinged on whether the jury could have been persuaded that Hale was, in his mind, talking about Amend, not Judge Lefkow. Obviously, this would have been a highly risky strategy,

---

[8] As Hale has pointed out throughout his filings in this case and again now, he did tell Evola, after Evola stated that the plan to murder Judge Lefkow was in motion, that the plans were "too serious," that he wasn't a party to anything, and that he didn't "want anything." However, as the court has stated in prior orders addressing this argument (see, in particular, 1:03CR11 DE #249 at 17 n. 17), these remarks came just after Hale reminded Evola that it was "not exactly wise to tell" Hale anything about the plot. Viewed in the entire context, the remarks are plainly not the "categorical" rejection that Hale claims them to be. What Hale said was: "I'm not gonna have anything done. I'm just . . . saying that whatever a person wants to do and I, I have to be, I just can't, this is too serious. I just can't ah, yeah, incredible. Anyway, I don't want anything, you know. I'm not a party of anything. . . . not encouraging anything, just . . . if they do something, that's their own business." A reasonable view of this conversation is that Hale encouraged Evola to continue with the plan by reminding him that whatever he was going to do was his "own business," while engaging in the "plausible deniability" tactic by asserting that he was not a party and didn't want anything.

particularly when, as explained herein and in the prior orders and opinions in this case, a completely plausible view of the evidence is that Hale understood the discussion to concern Judge Lefkow from the start.

The court now individually addresses each of Hale's sub-arguments.

*a. "Failure to Understand the Facts of Hale's Case" [Hale's II.B.1.a]*

In this section of his brief Hale makes three points: 1) his attorney failed to understand that Hale's use of the word "information" in a conversation with Evola on December 5, 2002, meant the addresses of several individuals, including Judge Lefkow, which in turn meant that Evola's use of the word "it" later in the conversation referred to all of those addresses, not just Judge Lefkow's, showing that Hale thought lawyer Amend was being discussed; 2) that "part of the reason" for the attorney's failure to understand was that the attorney "***failed to adequately consult*** with Mr. Hale prior to trial, refusing to visit him in jail and ***refusing to investigate*** Mr. Hale's adamant and repeated statement[s] to counsel that Judge Lefkow was not 'the rat' or 'Jew rat' referred to" in the conversation, lawyer Amend was" (DE #18 at 16-17); and 3) counsel failed to present this defense because, as he admitted during closing argument, he didn't think a defense was necessary, thereby "testing the fates with Mr. Hale's freedom." (DE #18 at 17.)

As to the first point, this is the same argument Hale made in post-trial motions, which the court has already considered and rejected. (1:03CR11 DE #25-1 at 4-5.) The conversation Hale is referring to is as follows:

15

Evola: Well, I got your e-mail about the Jew judge . . .
Hale: Right.
Evola: . . . you wanting his address and [all his rats'].[9]
Hale: That information, yes, for educational purposes and for whatever reason you wish it to be.
Evola: Are we gonna . . . I'm workin' on it. I, I got a way of getting it. Ah, when we get it, we gonna exterminate the rat?

Recorded conversation of 12/05/02.

The only thing the court will add to its prior discussion of this argument, directly in response to Hale's contention that his attorney didn't understand that "information" referred to several addresses, is that it is doubtful that defense counsel—or for that matter, anyone hearing/reading the conversation quoted above (no matter that the transcript of the bracketed portion actually read "the other rats")—would fail to understand that in context, "that information" may very well have meant several addresses, not just Judge Lefkow's. In fact, as the government points out in response to Hale's motion (DE #30 at 6), defense counsel's cross-examination of Evola shows that counsel understood that to be the case: "Now, that e-mail I just showed you, December 4, that was an e-mail where he's [Hale] asking for addresses, correct?" (Tr. Vol. 9 at 76.) "And it says in there [December 5 e-mail] that he's [Hale] in the process of getting the people's home addresses in there, correct?" (Id. at 79.)

---

[9] The transcript of this conversation furnished for the jurors' reference actually stated "the other rats" (without an apostrophe). For the purposes of the discussion herein, the court accepts Hale's claim that what was actually said was "all his rats'.'" In the court's view, whichever version is correct is not critical, because both are equally susceptible of allowing the interpretation of "that information" to mean all of the addresses, not just Judge Lefkow's.

More importantly, that understanding—that Hale was seeking to obtain multiple addresses—doesn't change a thing. This is because Evola's focus in the conversation is singular: the email about "the Jew judge," Hale wanting "his address"[10] and when the information was obtained using it to exterminate "the rat." Hale never explains why it logically follows, from any interpretation of this conversation, that "the rat" was lawyer Amend.[11] Apparently this is to be inferred from the phrase "his address and all his rats," in other words, "his" refers to the "Jew judge" and "all his rats" must therefore refer to the attorneys involved,[12] one of whom was Amend.[13] And if that is the interpretation, Hale also doesn't explain why he would have understood Evola to be singling out Amend from the group of attorney rats as the one rat chosen for extermination. In fact, Hale's insistence that the phrase "all his rats" was used makes it seem more—not less—likely that he understood the discussion to concern Judge

[10] At that time, Evola thought that Judge Lefkow was a male. (Tr. Vol. 9 at 75.)

[11] Hale does show that there is evidence that he often referred to Amend as the "Jew rat." However, this is not compelling, because the term "rat" was commonly used to refer to perceived enemies of Hale's organization. (Tr. Vol. 9 at 75-76.)

[12] Hale offers no explanation why Evola, while distinguishing between the attorney rats and the judge, would nevertheless describe the attorney rats as "his" rats—that is, belonging to the judge. This incongruity suggests the transcription of the conversation, using the phrase "the other rats" instead of "all his rats," was in fact correct.

[13] Without directly making the point, Hale suggests this by pointing out that later in the conversation Evola stated he would get the address of the "Jew judge, *lawyer rat*." (DE #18 at 15.) However, there was evidence at trial that it was common for Hale and his followers to refer to anyone perceived to be against their interests as a "rat." (Tr. Vol. 9 at 75-76.)

Lefkow: wouldn't it be more likely to consider exterminating the leader of the group, than one of several unnamed rats?

Hale's second point is that "part of the reason" his attorney supposedly failed to understand that Hale thought Evola was initially proposing the murder of lawyer Amend was that he "*failed to adequately consult* with Mr. Hale prior to trial, refusing to visit him in jail and *refusing to investigate* Mr. Hale's adamant and repeated statement[s] to counsel that Judge Lefkow was not 'the rat' or 'Jew rat' referred to" in the conversation, lawyer Amend was." (DE #18 at 16-17.) Besides the internal contradiction in the sentence—how could Hale have made repeated statements to his attorney if his attorney wasn't meeting with him?[14]—Hale fails to explain how any investigation would have uncovered evidence revealing Hale's thought processes at the time he and Evola had the initial conversation.[15]

For example, if Hale had a contemporaneous conversation with another person confirming that he and Evola were plotting to murder Amend, he hasn't revealed that evidence. In fact, and to the contrary, there was evidence at trial that Hale

---

[14] The assertion made in Hale's brief, that his attorney refused to visit him in jail and did not consult with him adequately prior to trial, is not borne out by Hale's declaration in support of his motion. Although that declaration suggests that attorney Thomas Durkin may not have consulted with Hale as often as Hale would have liked, co-counsel Patrick Blegen also represented Hale, and Hale's declaration shows that he and Blegen frequently consulted and discussed the issues considered herein.

[15] Of course, a further reason not to conduct any such investigation would be that a strategic choice to pursue the entrapment defense had already been made. Effective representation includes making reasonable decisions that particular investigations are unnecessary. *Strickland*, 466 U.S. at 691.

contemporaneously asked another of his followers to murder Judge Lefkow,[16] a further reason why the defense Hale propose now would have been a poor strategic choice. In short, however, relief will not be granted under § 2255 based on an assertion that an inadequate investigation was conducted when the movant does not explain what the investigation would have uncovered and how it would have helped his defense. *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003).

Hale's third point is that his lawyer didn't present the defense Hale now believes would have been better, because the attorney didn't think it was necessary. This really isn't an argument that Hale received ineffective assistance of counsel, it is simply a reiteration of Hale's belief that his attorney was ineffective for not pursuing the alternative defense Hale now argues would have been better. The court will only add that the best, and perhaps only, evidence of what Hale understood Evola to have been proposing at the time they first spoke would have had to come in through Hale's own testimony at trial, as Hale admits: "Counsel had, but failed to present, the testimony of . . . Mr. Hale himself that would have refuted the government's claim." (DE #18 at 14.)[17]

---

[16] This was the basis for the solicitation charge involving Jon Fox, on which the jury found Hale not guilty. Although, in the court's view, the evidence on this charge was quite strong, the government's main witness, Fox, was shown by the defense to be an admitted liar and to have reasons to testify against Hale to advance personal interests.

[17] The ellipsis omits a reference to two other witnesses who would have testified that Hale had referred to Amend as a "Jew rat." That testimony does not, as Hale argues now, refute the government's contention that the "rat" in the conversation was the "Jew judge."

The decision whether or not to testify in his own defense was Hale's alone, *Rock v. Arkansas*, 483 U.S. 44 (1987); *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984), and Hale, who is an attorney, has not alleged that he did not understand that: in fact, he executed a written waiver of his right to testify. (1:03CR11 DE #147.)[18] Taking the stand to testify in one's own defense is typically not a wise tactical decision, however, *Curtis*, 742 F.2d at 1076, and undoubtedly that was true in this case. The court cannot fault defense counsel for not putting Hale on the stand to testify in support of what would have been, for all the reasons given herein, an ill-chosen defense.

b. *"Failure to Advocate the Truth of Mr. Hale's Case"* [Hale's II.B.1.b]

In this subsection of his brief, Hale simply reiterates his previous argument that his attorney did not pursue the correct defense. He adds only that when his attorney cross-examined Evola, he pressed Evola to admit that on December 5, 2002, Evola was talking about killing a judge, which was "adverse to the truth and very detrimental to the defense," and again shows that "counsel failed to realize and argue that Mr. Hale had rejected Evola's plan on December 17, 2002." (DE #18 at 17.) As the government points out in its response, obtaining such an admission would have supported Hale's entrapment defense, and, for the reasons explained above, the court does not fault counsel's pursuit of an entrapment defense in place of the supposedly better defense

_____

[18] Hale's argument that he executed this waiver only as the result of ineffective assistance of counsel in connection therewith is discussed *infra*.

that Hale thought Evola meant to murder Amend. Thus, this argument lends no support to Hale's claim of ineffective assistance.

### c. "Failure to Call Exculpatory Witnesses Greenwald, Schlismann, Reardon and Mr. Hale Himself to Support This Defense" [Hale's II.B.1.c]

Hale argues that these witnesses should have been called, because all have testified that Hale had previously used the term "Jew rat" to refer to lawyer Amend, thus contradicting the government's claim that Hale's December 5, 2002, email message concerned Judge Lefkow. In addition, Hale and Schlismann would have testified that Evola himself had used the term "Jew rat" to refer to lawyer Amend.

As the government points out in its response, during defense counsel's cross-examination of Evola, Evola admitted that "rat' was a term used frequently for "traitors or somebody who was against the church," and that Amend was a traitor so the term could have been used on occasions for him. (Tr. Vol. 9 at 7-76.) Therefore, not calling additional witnesses to testify to essentially the same fact does not fall below a minimal standard of competence. This is particularly true where, as the government argues, these witnesses were likely to create other problems for the defense. For example, proposed witness Greenwald, an attorney who had previously represented Hale in several civil cases, states in his declaration that he would have testified that Hale had clearly expressed that he believed only in peaceful activism and was opposed to violence and illegal conduct. (DE #8-3 at 4 ¶ 2.) This testimony would have been difficult to reconcile with the defense that Hale proposes, that he was soliciting Evola to

murder Amend, rejecting the plan only when Judge Lefkow became the target; moreover, failing even then to counsel Evola against carrying out the plan. In short, there was no error in failing to present essentially cumulative evidence that "rat" was a term frequently used by Hale to refer to Amend and others.

> d. *"Failure to Hold the Government to its Burden of Proving That Evola Was Referring to Judge Lefkow and Not Lawyer Amend on Dec. 5, 2002" [Hale's II.B.1.d]*

Hale's argument is that "there was no direct evidence—only attorney argument—that the 'rat,' 'Jew rat,' referred to in the Dec. 5, 2002 conversation was Judge Lefkow," and that defense counsel abdicated his duties by failing to argue during closing that the government had failed to meet its burden of proof on that issue. This argument ignores the fact that cases can be proved entirely by circumstantial evidence, and as has been discussed herein and in prior orders in the criminal case, there was ample circumstantial evidence to allow a reasonable jury to conclude that Hale and Evola were referring to Judge Lefkow. Moreover, in context, the conversation itself *is* essentially direct evidence of who was meant by "rat." Hale's attorney did not fail to hold the government to its burden of proof.

> e. *"Erroneous Stipulation to the Accuracy of the Government's Transcripts" [Hale's II.B.1.e]*

During many (if not most) of his meeting with Hale over a period of several years, government-informant Evola wore an electronic device which allowed the government to monitor and record the conversations. Several of the recordings were admitted as evidence and played for the jury. Transcripts of the recordings were

furnished for the convenience of the jurors as they followed along. Hale argues that his attorney's stipulation to the accuracy of the transcripts was an error, because the transcripts themselves contained errors which harmed his defense or the defense which should have been used. Specifically, Hale complains of: 1) an extra comma inserted between "lawyer rat" which turned that reference to one person into a reference to two persons; 2) that there should have been an apostrophe making "rats" possessive so the jury would have understood that Evola's reference to Hale "wanting his address and the other rats" meant Hale had asked for four addresses,[19] in turn indicating that there was no proof that Judge Lefkow was "the rat, Jew rat" in question in the conversation; and 3) that a transcript should not have indicated that Hale had "chuckled" when Evola expressed designs on Judge Lefkow's life.

As the government indicates in its response, the jurors were repeatedly instructed, as the recordings were played, that the transcripts were furnished only for assistance, that the recordings themselves were the evidence, and that, should they notice a discrepancy with the transcript, they should consider only what they heard on the recording. (See, *e.g.*, Tr. Vol. 7 at 9, 13, 18.) The final jury instructions the court read to the jury, and provided each juror a copy of during deliberations, repeated this information as Instruction No. 14, specifically stating: "It is up to you to decide whether the transcripts correctly reflect what was said" and that "[i]f you noticed any difference

---

[19] It should be noted that, with or without an apostrophe, the court thinks it is entirely clear, whether the transcript or the recording is relied on, that the meaning of the statement was "his address and the other rats[' addresses].".

between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read." (1:03CR11 DE #160 at 16.) Juries are presumed to follow the court's instructions. *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007). Therefore, if the recordings were as Hale states, any inaccuracies in the transcripts caused no prejudice.

Hale's response is that the presumption does not matter here because tape recordings do not show punctuation, and so, without a defense objection, the jurors were "much more likely" to accept the "incorrect and misleading version" in the transcripts. The basis for the instruction given by the court, however, is that jurors can discern such things as whether or not there was a spoken pause, which would be indicated by a comma in the transcript. Therefore, if the mistakes in the transcript are as plain as Hale argues, then the jury heard the "truth," and is presumed to have followed the instructions. If the mistakes are not as plain as Hale believes—and, with the exception of the apostrophe, this seems to be the case, then defense counsel did not err by failing to object to the portions Hale disputes now. In short, the transcript issue is a non-issue.

   f. *"Failure to Impeach the F.B.I. Agent Regarding the Transcripts'
       Inaccuracies" [Hale's II.B.1.f]*

Hale argues that, had his counsel obtained a professional analysis of the original December 5, 2002, tape recording, or impeached F.B.I. Agent Deterding using earlier drafts of the transcripts which had been prepared, the jury could have been shown that

the portion of the transcript referring to "his address and all his rats" actually was "his address and the other rats'" and concerned lawyer Amend, not Judge Lefkow.

As to the failure to impeach Agent Deterding, Hale is referring to the fact that a working draft transcript prepared prior to trial, as the tapes were being reviewed and transcripts prepared, transcribed the disputed portion as Evola saying to Hale "you wanting his address and all his rats'," while the final transcript used at trial, which defense counsel agreed to, read "you wanting his address and the other rats." Hale has steadfastly maintained starting with his post-verdict motions that this is a critical difference. Hale's argument that it was an error not to have the tape professionally analyzed goes to the assertion he has made all along that the change in the transcript suggests that the tape recording was physically altered and/or tampered with. (1:03CR11 DE #219.)

If defense counsel had "impeached" Agent Deterding with the draft transcript, the court would agree that it can be presumed that the jury would have listened to this portion of the recording more carefully. But even if the jury decided that Evola said "all his" and not "the other," the court does not now—and has never—agreed with Hale's argument that this dramatically changes the meaning of the conversation, so that the jury would have understood the "rat"being discussed to be lawyer Amend, and not Judge Lefkow. The court incorporates here its discussion of this issue from above, and its explanation in prior orders, in particular from 1:03CR11 DE #250-1 at 4-5.

This remains true whether the "it," in Evola's question, "when we get it, we gonna exterminate the rat?" meant Judge Lefkow's address, as the court previously assumed (1:03CR11 DE #250-1 at 4), or referred to the addresses of Judge Lefkow and all of the attorneys involved in the litigation in her court, as Hale contends. Either way, the "rat" to be exterminated could have meant Judge Lefkow. No matter how the language at issue is heard, the monumental difference Hale ascribes to it simply does not exist. Therefore, his defense counsel did not fall below a minimum standard of competence by failing to obtain professional analysis of the recording, or failing to impeach Agent Deterding with the draft transcripts.

g. *"Defense Counsel Rendered Mr. Hale Ineffective Assistance" [Hale's II.B.1.g]*

This section of Hale's brief simply recapitulates everything argued previously, that is, that Hale's defense counsel failed to understand and utilize the best defense, and failed to present evidence and witnesses that would have supported that defense. As nothing more than a recapitulation, the analysis above is sufficient to address this portion of Hale's memorandum. Moreover, it should be pointed out, once again, that defense counsel's failure to use an alternative defense which Hale now—or even at the time of his trial—believed superior to the defense that was presented does not show that Hale received ineffective assistance. Only if that decision was one that no competent attorney would have made, and only if that mistake caused Hale prejudice, did Hale receive ineffective assistance of counsel. The analysis above shows that is not the case.

2. *"Failure to Fully Investigate and Failure to Present Exculpatory Witnesses and Information" [Hale's II.B.2]*

Ineffective assistance claims based on alleged failures to conduct a thorough investigation, or to present exculpatory testimony have a common element: the movant must show what would have been supplied by the missing information, that is, what a supposedly proper investigation would have uncovered, or what the uncalled witnesses' testimony and information would have been. *See Williams v. Washington*, 59 F.3d 673, 684 (7th Cir. 1995) ("failure to investigate cannot be used as a substitute for proof of prejudice"). There must be a reasonable probability that the testimony that would have been given by the uncalled witnesses would have produced a different result. *Galowski v. Murphy*, 891 F.2d 629, 638 (7th Cir. 1989). Hale's allegations in this regard, and affidavits from uncalled witnesses, are not sufficient to raise issues that cast doubt on the result and require an evidentiary hearing.

a. *"Failure to Have the Dec. 5, 2002 Tape Professionally Analyzed" [Hale's II.B.2.a]*

Hale's argument on this issue consists of one sentence:

Counsel failed to have the Dec. 5, 2002 recording of the conversation between Mr. Hale and Evola professionally analyzed even though the government's original transcript confirmed that the "rat," "Jew rat" whom Evola proposed exterminating was an attorney and ***not*** Judge Lefkow (the attorneys were the "rats" ("all his rats' "), not Judge Lefkow).

(DE #18 at 22.) Despite the skeletal nature of this argument, the court knows from Hale's argument as a whole, as well as from his earlier filings in this case, that what he means is that a professional analysis would reveal that the tape recording has actually

been tampered with, to change the words on it, or at least that the transcript used at trial was incorrect. (1:03CR11 DE #219.)

First, as has been explained herein and in prior orders, not only does the context of the entire conversation make Hale's version of the conversation and claim that it has been altered seem unlikely, even if the conversation was exactly as he would have it, that makes little, if any, difference. (1:03CR11 DE #250-1.) But more importantly for present purposes, during the time of Hale's direct appeal through the denial of his petition for *certiorari*, and the entire year thereafter spent preparing his § 2255 motion, the tape recording has been available to him for analysis. (see 1:03CR11 DE #244 at 4 n. 6 (ordering preservation of original tape for future testing and analysis); 1:03CR11 DE #245 at 3 ("I [Hale] certify in advance that my family has offered to pay for such an analysis.")). Nevertheless, Hale has never requested that the court order the tape to be delivered to an expert for analysis. He cannot base an ineffective of assistance of counsel claim on nothing more than his speculation that an analysis of the tape would have revealed an alteration.

*b. "Failure to Call Exculpatory Witnesses Peterson, Moudry, Attorney Greenwald, Robertazzo, Logsdon, Powers, Attorney Reardon and Russell Hale, Jr." [Hale's II.B.2.b]*

Hale presents affidavits from these witnesses (with the exception of Shawn Powers) containing the key aspects of what he believes would have been their exculpatory testimony, and summarizes that testimony in his brief. Without repeating that summary testimony here, the gist of it is that the witnesses would have related

statements Hale made to them showing that he wanted Judge Lefkow's address only so that a peaceful protest could be held outside her home; that he was working on motions to be filed in the trademark case pending before Judge Lefkow; that Hale intended that his church's reaction to Judge Lefkow's order in the trademark case would be entirely peaceful, and that Hale had been using the term "Jew rat" to refer to lawyer Amend. This testimony, Hale asserts, would have shown that his state of mind was inconsistent with having an intent to have Judge Lefkow murdered. In addition, in his recently-filed supplement (DE #48), Hale indicates that two of the witnesses, Petersen and Robertazzo, would have supported Hale's claim that he suspected, long before the events leading to the charges, that Evola was a government informant, and he therefore would not have solicited Evola to murder Judge Lefkow.

As the government points out in its response, the substance of nearly all of these points were effectively made at trial using other evidence.[20] For example, recordings were introduced into evidence, and played for the jury, in which the jury heard Hale himself state that it was his intention to follow the law, and that the Church was peaceful and non-violent; during cross-examination of the government's witnesses, defense counsel obtained admissions that Hale was seeking Judge Lefkow's address to conduct a demonstration at her home, and that point was emphasized during closing.

---

[20] This is not true regarding the purported testimony of Hale's father that Hale had told him, on the night of December 17, 2002, that Evola "wanted [him] to do something wrong." Because of the obvious bias inherent in his father's testimony, it is not at all likely that Hale suffered prejudice from counsel's decision not to call him.

Attorneys are not ineffective when they fail to present evidence which is merely cumulative. *United States v. Jackson*, 935 F.2d 832, 845-46 (7th Cir. 1991).

This is even more true when, as here, putting those witnesses before the jury presents other dangers. The government points out that had Todd Reardon, the attorney for the Church in the trademark litigation, been called, he would have had to concede that Hale was intimately familiar with the details of the litigation, bolstering the government's case on Count 1, charging Hale with obstructing justice by sending the judge presiding over the case a letter containing a false statement. As to Kathleen Robertazzo, besides issues with her credibility, her testimony that Hale had sent a scathing e-mail to a Church member who had posted violent rhetoric on the Church's website would have been compared unfavorably by the government to the fact that Hale never similarly chastised Evola, only heightening the seriousness of their conversations.

Hale also argues that witnesses Petersen and Robertazzo would corroborate what Hale told the FBI shortly after he was arrested—that he had suspected for a long time that Evola was a government informant—by stating Hale had told them that same information long before his arrest. The jury did hear evidence that after his arrest, Hale had written a letter (admitted at trial as Gov. Ex. 12) to another WCOTC leader, Jon Fox, reminding Fox to "remember" that Hale had stated in the past that Evola was an informant; but at trial, Fox testified that Hale had not said that, and the letter was a request for him to lie. (Tr. Vol. 6 at 66-67.) Hale argues that Petersen and Robertazzo

would corroborate that he had, in fact, always expressed doubts about Evola, which would prove that he never would have solicited Evola to commit Judge Lefkow's murder.

Of course, not only might the jury have wondered why Hale would have placed a suspected informant in charge of the "White Berets," the supposed elite security force for the WCOTC, this would also be inconsistent with the crux of the defense Hale believes should have been pursued, that he thought that he and Evola *were* discussing the murder of lawyer James Amend. But putting this logical inconsistency aside, the affidavit provided by Robertazzo doesn't say Hale told her that he thought that Evola was an informant, it states that she told Hale she thought that was the case. (DE #8-3 at 38 ¶ 16.) But assuming that she would testify that Hale agreed with her—and Petersen's affidavit does say that Hale told him Evola was a suspected informant (DE #8-3 at 31 ¶ 16)—both Robertazzo and Petersen are sympathetic to Hale and the WCOTC. Petersen was the leader of the WCOTC for the state of Wisconsin; Robertazzo has had extensive e-mail correspondence with Hale because she is "attracted . . . to Matthew and his civil rights movement." (DE 8-3 at 29 ¶ 2; 36 ¶¶ 4-5.)

Considering the bias of these witnesses in Hale's favor, and all the other evidence of Hale's interactions with Evola, the court does not believe that calling these witnesses would have had any impact on the jury. Decisions whether or not to call particular witnesses are generally unreviewable matters of strategy, *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005), and here, in addition, the court does not believe any prejudice

resulted. Hale's argument that his counsel was ineffective for failing to call a number of witnesses whose affidavits have been provided and testimony summarized is not persuasive.

### c. "Failure to Present Evidence on Mr. Hale's Lack of Predisposition" [Hale's II.B.2.c]

Hale argues that his attorney failed to introduce evidence that would have supported his entrapment defense, that is, the testimony of the witnesses above that he was peaceful and law-abiding. For the reasons already discussed, this did not cause prejudice. In addition, Hale argues that counsel failed to impeach Evola by showing that Hale had condemned violence in Evola's presence, such as by remarking that he wished that Benjamin Smith had shot him (Hale) in the leg instead of carrying out his multi-state murder spree.[21] Hale does not show how this evidence would have been established, if Evola denied the conversations, without he himself testifying, which right he waived. Therefore, again, Hale has failed to establish either a sub-par performance by his attorney or any resulting prejudice.

### d. "Failure to Offer Exculpatory Documents, Recordings and Testimony" [Hale's II.B.2.d]

Hale argues that his attorney failed to present evidence (much of it in the form of testimony by the witnesses discussed above) that would have shown that the "state of war" declared against Judge Lefkow was a legal and non-violent "war" that had nothing to do with violence. Besides the fact that such evidence would have done little

---

[21] Hale does not cite a recorded conversation containing this statement.

or nothing to change or illuminate the meaning of the key conversations between Hale and Evola, the jury did hear evidence of this nature. For example, government witness Burnett stated during cross examination that his understanding of the term "RAHOWA"—a reference Hale often used meaning "racial holy war"—gleaned from his time with Hale was that it meant "a mental holy" not a "holy war of violence." (Tr. Vol. 5 p. 29.) The jury also heard evidence of numerous statements by Hale such as "all we can do at this point is be legal and be peaceful and follow the rules. That's all we can do because, you know, if we weren't to do that then, it would be even worse[.]" (Gov. Ex. 12/3/00 at 2.) Hale's attorney's performance in this regard was not deficient.

  *e. "Failure to Interview Witnesses John Schlismann and James Burnett"*
   *[Hale's II.B.2.e]*

  Hale argues that his attorney was ineffective for failing to interview, or call as a witness, John Schlismann, who would have testified that Hale and Evola both referred to lawyer Amend as a "Jew rat," and failed to interview government witness Burnett, which might have allowed the defense to learn that the government coerced Burnett into giving false testimony, or so Hale now alleges.

  The failure to interview Schlismann, or present his testimony, was of no consequence. As has been explained herein and in multiple prior orders in this case, the jury heard right from the mouth of informant Evola that the term rat was frequently used to refer to all perceived enemies of the Church. In his own affidavit in support of his motion, Hale points out that his attorney, during cross-examination of Evola,

obtained Evola's admission that "Jew rat" was a term that "couldn't be just limited to

one person," that "rat" was frequently "used for traitors or somebody who was against

the church," and that Amend was considered to be a traitor. (Tr. Vol. 9 at 75-76.) With

this admission from the government's own informant, it was unnecessary to offer

another witness to make the same point.

   As to Burnett, the only evidence that the government coerced Burnett into giving

false testimony is in an affidavit provided by David Hale, presumably defendant's

brother,[22] in which he describes an incident that occurred post-trial in which he ran into

Burnett in a bar in East Peoria, and a "teary eyed" Burnett told him that he (Burnett)

was afraid that Hale's father might be mad at Burnett for testifying at trial, and that the

government had placed him in handcuffs and told him what to say when he testified.

The reasons why Burnett, a former ally of Hale, might want to absolve himself of

responsibility in a bar-room conversation with Hale's brother, are obvious. Without

some present corroboration from Burnett himself, this is simply not sufficient to create a

question that Hale's attorney was ineffective for not interviewing Burnett prior to trial.

   *f. "Failure to Offer Mr. Hale's Exculpatory Testimony" [Hale's II.B.2.f]*

   At trial the government compared Hale's having provided Evola with Judge

Lefkow's address to a previous occasion when Hale had provided another individual's

(Ken Dippold) address to Evola, in order for Evola to murder him. Hale states that he

had informed his attorney prior to trial that Dippold's address had been provided to

---

[22] *See* DE #8-3 at 6 ¶ 7.

34

Evola only for a peaceful purpose, in response to Evola's request to complete his files which contained the addresses of all church members. He argues that his attorney was ineffective for not having him testify to this at trial, or at least for not impeaching Evola by asking him whether that were the case. As to the first point, again, Hale waived his right to testify at trial, and the validity of that waiver will be discussed further herein. As to the second point, it is unknown whether Evola would have agreed that he asked Hale for the information. In addition, although the comparison to Hale having provided Dippold's address was important to the government's case, it was not critical: the recorded conversations between Hale and Evola concerning Judge Lefkow are damning by themselves. For these reasons, Hale cannot show prejudice resulted from his attorney's failure to attempt to impeach Evola by inquiry into this matter.

g. *"Failure to Rebut Government Evidence" [Hale's II.B.2.g]*

Hale argues that although the jury heard evidence of comments he made concerning the Ben Smith shooting spree, suggesting he had a violent predisposition, his attorney did not put into evidence the many comments he had made condemning Smith's crimes and violence in general. This proposed evidence is sprinkled throughout the various affidavits Hale has attached in support of his motion. For example, in the affidavit provided by his father, Russell Hale, Mr. Hale states: "Matthew, since the shooting spree ended, has denounced on multiple occasions what Smith did." (DE #8-3 at 18 ¶ 9.) As already noted above, it is unlikely that testimony from Hale's own father would have had much impact on the jury. Moreover, as has already been mentioned

herein, the jury did hear ample evidence, much of it consisting of defendant Hale's own statements, of him denouncing violence and stating that the WCOTC would use peaceful means to achieve its objectives. His attorney's failure to offer cumulative evidence on this point, from Hale's father, did not cause prejudice.

Moreover, some of the proposed testimony is not even as favorable to Hale as he suggests. For example, Brian Moudry states in his affidavit that regarding Ben Smith, "although Reverend Hale sympathized with some of his feelings, he did not believe that Ben Smith's actions did our movement any good and, in fact, believed that it set us back in the public eye." (DE #8-3 at 27 ¶ 11.) Christopher Lee Peterson states in his affidavit that Hale told him that Smith's actions were "a blow to the reputation of our Church," and that "the Church's position on the shootings was that we condemn Ben Smith's violent acts, but not Ben Smith personally," (DE #8-3 at 30 ¶¶ 7-8), begging the question why a peaceful and non-violent person wouldn't condemn someone who had gone on a murder rampage. In both cases, the implication is that Hale did not disagree with Smith's actions because of his own peaceful and non-violent nature, but only for the practical reason that he did not view Smith's actions as advancing the WCOTC's interests. Thus, this testimony would have done little, if anything, to convince the jury that Hale was truly opposed to violence.

As explained above, Hale's attorney did offer other evidence of statements Hale had made condemning violence and explaining that the Church would work using peaceful methods. Particularly in light of how unpersuasive the additional evidence

Hale identifies is, his attorney was not ineffective for choosing to use the witnesses and evidence he did, and not offering this cumulative evidence of Hale's disposition and alleged comments regarding the Smith shooting.

   *h. "Defense Counsel's Representation was Deficient and Prejudicial" [Hale's II.B.2.h]*

   This section of Hale's memorandum simply reiterates and summarizes all of the points previously raised (and discussed above), concluding that his attorney failed to thoroughly investigate and understand the case, and so failed to use the available evidence to present the "best" defense; that is, showing that Hale had neither the predisposition nor intent to solicit Judge Lefkow's murder, and he rejected Evola's proposal to do so. For all of the reasons discussed above, the court disagrees with the particulars of this argument, disagrees that this strategic course would have been Hale's "best" defense, and, moreover, even if it were, disagrees that his attorney was ineffective for choosing to use an alternative defense. The decision as to what defense is "best" is subjective and a matter of strategy, and counsel is ineffective only if the defense actually utilized was so deficient that no attorney acting in a professionally competent manner would have done so. The court believes that the discussion above shows why that is obviously not true here.

   *3. "Failure to File a Meritorious Motion to Suppress" [Hale's II.B.3]*

   Hale argues that his attorney was ineffective for failing to file a motion to suppress evidence that was seized from Hale's residence, which also served as the "world headquarters" for the WCOTC. As Hale forthrightly explains, to establish a

claim of ineffective assistance based on this argument, he must show both that the motion to suppress would have been meritorious, and that had the evidence been suppressed, there is a reasonable likelihood a different verdict would have been reached. *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005); *Owens v. United States*, 387 F.3d 607, 610 (7th Cir. 2004).

First, in subsection (a) of this portion of his brief, Hale argues that the search warrant was invalid on its face because it did not state that there was probable cause to believe that a crime had been committed, nor did it specify any statute which there was probable cause to believe had been violated. Although the warrant stated that the issuing judicial officer found that the affidavit in support of the application for the warrant "establish[ed] grounds for the issuance" of the warrant, and that affidavit did specify the alleged statutory violations which evidence was sought in connection with, Hale argues this does not remedy the warrant's invalidity, because the warrant did not incorporate the application and affidavit by reference.

Taking this last point first, the Court of Appeals has held that an application and affidavit supporting a search warrant can supply the needed particularity, even when not attached to or incorporated by reference, when the issuing magistrate considered the affidavit and the executing officers complied with its terms, which has not been questioned here.[23] *United States v. Jones*, 54 F.3d 1285, 1290-92 (7th Cir. 1995); *see United*

---

[23] No doubt, Hale argues that the terms of the warrant were too broad. What the court means here is only that Hale's argument that the warrant itself was facially invalid is incorrect.

*States v. Dennis*, 115 F.3d 524, 529 (7th Cir. 1997). Clearly, the affidavit submitted in support of the application for the search warrant was considered, because it was sworn to before Magistrate Judge Gorman, who then issued the warrant. (DE #36-2 at 44.) Last, the affidavit was submitted by Agent Coughenour, to whom the warrant was then issued for execution (DE #36-2 at 3), and that weighs strongly against applying the exclusionary rule simply because the warrant itself may have been lacking in particularity. *United States v. Stefonek,* 179 F.3d 1030, 1034 (7th Cir. 1999).

As to Hale's main point, that the warrant was facially invalid because it itself did not specify a crime, or state that probable cause existed to believe that evidence of the unspecified crime would be found, Rule 41(e) of the Federal Rules of Criminal Procedure imposes no such requirements on a warrant. Instead, Rule 41(e) requires only that the warrant "must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned."[24] Fed. R. Crim. P. 41(e)(2)(A).

---

[24] In addition the warrant must command execution within a time period not longer than 14 days, during the daytime (unless execution at another time is authorized for good cause shown), with return to the magistrate judge designated therein. Fed. R. Crim. P. 41(e)(2)(A)(i)-(iii).

Hale has cited no authority[25] for the requirement which he contends exists, and it is particularly appropriate to note that Rule 41 was amended in 1972 to eliminate any such requirement. As explained in the Advisory Committee Notes:

> The requirement that the warrant itself state the grounds for its issuance and the names of any affiants, is eliminated as unnecessary paper work. There is no comparable requirement for an arrest warrant in rule 4. A person who wishes to challenge the validity of a search warrant has access to the affidavits upon which the warrant was issued.

Thus, the warrant was not facially invalid for failing to specify the statute(s) Hale had allegedly violated.

In subsection (b), Hale argues that a motion to suppress would have been meritorious because the warrant issued didn't describe the items to be seized with sufficient particularity, and in subsection (c) that it was not issued based on probable cause because the application and affidavit failed to establish a nexus between the items to be seized and the crimes alleged. Hale's particularity argument is that the warrant

_____

[25] To be fair, in his reply brief Hale does cite *United States v. Bridges*, 344 F.3d 1010, 1016 (9th Cir. 2003), as a case holding that where a search warrant used "expansive and open-ended language," its failure to specify what criminal activity was being investigated rendered it constitutionally invalid. However, *Bridges* also states that the "Fourth Amendment requires search warrants to state with reasonable particularity what items are being targeted for search or, *alternatively*, what criminal activity is suspected of having been perpetrated. *Id*. at 1017 (emphasis added). Thus, the case does not stand for the proposition that failure to specify the crime in the warrant renders the warrant *facially* invalid, which is Hale's contention. Moreover, *Bridges* is a Ninth Circuit case which has never been cited by the Court of Appeals in this circuit, and appears to differ from Seventh Circuit precedent. As already noted, in this circuit an affidavit submitted in support of a search warrant can supply the necessary particularity, even when not incorporated or attached to the warrant. *See Jones*, 54 F.3d at 1290-92.

was overbroad, because by authorizing, without a limiting time period, the seizure of all "computers and computer related equipment," "newsletters, mailing lists, phone logs, address books, phone records that contain information regarding potential co-conspirators," and "documents and records pertaining to the WCOTC," the "agents were given 'carte blanche' to seize everything they saw." (DE #18 at 33.)  In addition, the warrant (in Attachment A) authorized seizure of "letterhead, labels, signs prints [sic] packages, and books that contain the term 'Church of the Creator,'" and Hale argues that because this implicates rights under the First Amendment, the warrant had to list the items to be seized with "scrupulous exactitude."[26] *See United States v. Hall*, 142 F.3d 988, 996 (7th Cir. 1998) (increased particularity necessary for items presumptively protected by First Amendment).

Hale's nexus argument cites *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) for the principle that "[t]here must, of course, be a nexus . . . between the

---

[26] Hale cites the dissenting opinion in *Nixon v. Admin. of Gen'l Serv.*, 433 U.S. 425, 530 (1977), as the authority for the "scrupulous exactitude" standard. But *Nixon* quotes *Stanford v. Texas*, 379 U.S. 476, 485 (1965), and *Stanford* applied that standard when the things to be sized "are books, *and the basis for their seizure* is the ideas which they contain." *Id.*  (Emphasis added.) In the present case the basis for the seizure of these items was not the ideas contained therein, but because of the trademark-infringing term "Church of the Creator." *See TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator*, 297 F.3d 662 (7th Cir. 2002). Thus, Hale relies on a standard that is inapplicable under the circumstances. *See Hall*, 142 F.3d at 996 (scrupulous exactitude required when basis for seizure is ideas contained in the items to be seized).

item to be seized and criminal behavior."[27] Hale then argues that a nexus didn't exist between the crimes for which probable cause may have existed and the items subject to seizure, mentioning the same categories as above, with particular emphasis that "there was no probable cause that ***anything*** listed in *Attachment A* regarding 'computers' or 'documents and records pertaining to the WCOTC' were connected with the criminal activity alleged in the *A.A.S.W.*" (DE #18 at 34.)

Hale's nexus argument is somewhat misleading, however, in that his quotation from *Warden, Maryland Penitentiary*, is not the holding of the case, and the case did not even involve a warrant: the question before the Court was whether items had been properly seized during a warrantless search. The Court abandoned the distinction between "mere evidence" and fruits of a crime, holding that it is reasonable, under the Fourth Amendment, to seize "mere evidence," and not just fruits, instrumentalities or contraband. *Id*. at 310. The comment on which Hale relies came in the context of the Court's observation that a nexus, supplying probable cause for seizure, automatically exists when the items seized are fruits, instrumentalities or contraband, but when "mere evidence" is sought, "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Id*. at 307.

---

[27] As explained in the accompanying text, this statement is not the holding of *Warden, Maryland Penitentiary*, which in fact is a case involving a *warrantless* search. However, the court accepts that the nexus requirement Hale proposes is required for Fourth Amendment reasonableness.

Thus, in the court's view, Hale's discussion of the lack of a "nexus" between the crimes of which Hale was suspected is simply an aspect of his argument that the warrant was a general warrant lacking in particularity:[28] because, in his view, it authorized the seizure of anything and everything, there is no connection between the items to be seized and criminal activity. Because it is a part of his particularity argument, the court considers his arguments on particularity and nexus/probable cause together in the following paragraphs.

First, as to the computers and computer-related equipment, the affidavit in support of the search warrant described how Hale had used computers at that location to communicate with Evola and other members of the Church, and in particular, to solicit information concerning Judge Lefkow and the attorneys involved in the trademark litigation against the WCOTC that she was presiding over, to declare that orders entered by the Judge caused a state of war to exist between her and the WCOTC, and to encourage members of the WCOTC to resist the "Jewish Occupational

_____

[28] All of the Seventh Circuit cases this court has found which discuss "nexus" as a discrete requirement for a search warrant do so in the context of the question whether there is a belief that the property sought will be at the location to be searched, that is, a physical nexus sufficient to create probable cause for the search. *See e.g.*, *United States v. Hobbs*, 509 F.3d 353, 361 (7th Cir. 2007). This is consistent with the common phrasing that: "A warrant application must demonstrate probable cause to believe that (1) a crime has been committed-the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched-the so-called 'nexus' element. With regard to the 'nexus' element, the task of a magistrate in determining whether probable cause exists is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *See United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) (citations omitted).

government" by treating its members "like the criminal dogs they are and take the law into our own hands." (DE #36-2 at 16-17.)[29] After an introductory paragraph stating that the residence to be searched was "often used by Hale to conduct WCOTC business. This includes using the computer located at the residence to access the internet, and e-mail WCOTC literature and propaganda," (DE #36-2 at 14 ¶ 10), the affidavit detailed many of the communications Hale had made using e-mail, such as those just described.

Thus, as the government argues, it was not overly-broad to authorize seizure of computers and computer-related equipment. Any such equipment could have contained electronic data that might be evidence, and a warrant only needs to identify the items to be seized "as precisely as the circumstances and the nature of the alleged crime permit." *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998). Thus, the warrant was not impermissibly broad in this regard, and clearly there is an evidentiary nexus between these items and the crimes which were alleged. *See United States v. Pritchard*, 745 F.2d 1112, 1121 (7th Cir. 1984) (warrant authorized seizure of wiretapping equipment including devices resembling telephone receivers, and agents seized every portable electronic item in the residence); *see also United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (warrant authorizing seizure of all video tapes and DVDs, all video and digital recording devices and equipment, all equipment used to

---

[29] Hale of course maintains to this day that the term "war" was used in a metaphorical sense only, and it was to be a peaceful war conducted legally in the courtroom and outside through picketing, protesting and the dissemination of information. Whether that is what Hale meant was a factual question which the jury clearly decided against him.

develop and upload or download photographs and movies, and all computers, not overbroad when agents did not know precisely what format the evidence might be kept in); *United States v. Hill*, 459 F.3d 966, 974-75 (9th Cir. 2006) (on-site search of a computer "could take many hours and perhaps days" and "would not only impose a significant and unjustified burden on police resources, it would also make the search more intrusive"); *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999) ("As a practical matter, the seizure and subsequent off-premises search of the computer and all available disks was about the narrowest definable search and seizure reasonably likely to obtain the images.")

As to "documents and records pertaining to the WCOTC," and "letterhead, labels, signs prints [sic] packages, and books that contain the term 'Church of the Creator'" the latter being the category Hale argues is governed by a "scrupulous exactitude" standard, first, even if that standard applies—as to which the court has doubts, see n. 25, *supra* at 40—it was met. By specifying that the items had to contain the term "Church of the Creator" the warrant limited seizure to items that contained an infringing mark. This identifies the items to be seized with the necessary exactitude, because the officers executing the warrant did not need to exercise discretion to determine whether an item should be seized. *See Hall*, 142 F.3d at 996. In addition, because the items contained the infringing mark, they lost their First Amendment protection. *See TE-TA-MA Truth Foundation-Family of URI, Inc.*, 297 F.3d at 667.

Regarding the first category, "documents and records pertaining to the WCOTC," Hale's argument is that the warrant was too broad because it:

> allowed the agents to seize everything the Church possessed. The F.B.I. clearly treated the warrant as a general warrant, and, accordingly, seized everything that the Church had, including the Church's flag.

Hale never explains precisely why the seizure of everything that the Church possessed is, necessarily, too broad.[30] For example, he expresses incredulity that agents seized the WCOTC's flag, but if that flag contained the trademark-infringing term "Church of the Creator," it put Hale in violation of orders entered in the case, and exposed Hale to a finding of contempt. Thus, the flag, and all items containing the mark, were potentially relevant to Hale's motive to interfere or impede Judge Lefkow's administration of the case, supplying the nexus that Hale believes was absent.[31] The affidavit submitted in support of the search warrant alleged that the items sought would link Hale to the crime of threatening to assault or murder a federal judge "with intent to retaliate (DE #36-2 at 11 ¶ 4, and intent to retaliate is an element of 18 U.S.C. § 115.

---

[30] As an aside, Hale hasn't asserted that he was a person who had standing to object to a possibly illegal seizure of property belonging to the WCOTC. The court assumes, however, that Hale had a privacy interest in the location where the property was kept, giving him that standing.

[31] In his reply memorandum, Hale argues that the warrant's authorization to seize any item containing the term "Church of the Creator" was too broad because Judge Lefkow's orders did not prohibit the WCOTC from possessing items containing that term, only items where that term was used as a trademark. Without expressing any opinion as to whether this distinction holds any water, the court notes only that it would be unreasonable to expect officers in the field executing the warrant to make a judgment whether the term was being used as a mark or "only as a term."

The purpose of the Fourth Amendment's particularity requirement is to ensure that an individual's property and privacy interests aren't invaded more than is necessary to achieve a valid law enforcement purpose. *Stefonek,* 179 F.3d at 1033. Only reasonable specificity is required, and identifying items by categories is sufficient to circumscribe the discretion of the executing officers. *United States v. Shoffner*, 826 F.2d 619, 632 (7th Cir. 1987). "A search warrant does not have to specify the precise documents sought (often an impossible task) in order to satisfy the Fourth Amendment." *United States v. Vanichromanee*, 742 F.2d 340, 347 (7th Cir. 1984). "Documents and records pertaining to the WCOTC" were potentially relevant to Hale's motive, by showing, whether or not, as he claimed, he was no longer directing the activities of the WCOTC and that its headquarters had been moved to Wyoming, and determining the identities of WCOTC members Hale had solicited to resist Judge Lefkow. As with the seizure of all computers and computer-related equipment, taking the time in Hale's residence to comb through these documents and records would have been more, not less, intrusive, of Hale's privacy, and the seizure of all such WCOTC records was not so broad as to fail the particularity requirement of the Fourth Amendment.

In its response the government does admit that one category of items to be seized—"newsletters, mailing lists, phone logs, address books, phone records that contain information regarding potential co-conspirators"—was not very specific. This was because, as Hale has pointedly noted, the warrant itself did not identify the

particular criminal statute allegedly being violated, leaving the meaning of the term "co-conspirator" unclear. The government argues, however, that the meaning of "co-conspirator" was defined by the context of that paragraph of the warrant, specifying that what was sought was "communications with other individuals associated with white supremacists [sic] groups relating to or discussing criminal activity and violence against others." (DE #36-2 at 4.) The court agrees that this context prevents the warrant from being overbroad. "The particularity requirement of the Fourth Amendment is to be applied with a practical measure of flexibility." *Shoffner*, 826 F.2d at 631.

Finally, even if the court's view now that the warrant was not overbroad is misguided, a motion to suppress the evidence which was seized pursuant to its execution would, nevertheless, have been unsuccessful because of the good-faith exception established in *United States v. Leon*, 468 U.S. 897 (1984). Under *Leon*, even if probable cause for issuance of the warrant was not established, evidence seized pursuant to the warrant will not be suppressed if the police relied in good faith on the warrant. *Id*. at 920-21. The decision to seek and obtain a warrant is itself *prima facie* evidence that the police acted in good faith. *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010). Therefore, the exception "applies unless the affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' or the warrant-issuing judge 'wholly abandoned' his neutral judicial role and 'serve [d] merely as a rubber stamp for the police.'" *Id*. (quoting *Leon*, 468 U.S. at 923).

Hale argues that the *Leon* exception does not apply because: 1) the warrant's facial invalidity (its failure to specify a crime) was so apparent that no reasonable officer could have relied on it; and/or 2) the affidavit submitted to obtain the search warrant was so lacking in probable cause that no reasonable officer could have relied on it. *See United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005). As to the first of Hale's two alternatives, the court has explained above that a warrant is not facially invalid simply because it does not specify the criminal violation which is suspected. Thus, because the warrant was not facially invalid, Hale's first alternative does not show a lack of good faith by the executing officers.

As to his second alternative, Hale explains:

> [E]ven though the government repeatedly defends the warrant by saying how it wanted or needed every document the WCOTC possessed (*e.g.*, "documents and records pertaining to the WCOTC") apparently out of some kind of belief that it should enforce Judge Lefkow's civil court order by use of a criminal search warrant, ***the probable cause upon which the warrant was based had nothing to do with anything other than a supposed plot against Judge Lefkow's life.*** Thus Agent Coughenour's own affidavit was lacking in probable cause since the general inventory of the Church's possessions certainly did not constitute evidence of a plot against Judge Lefkow's life. Thus, no reasonable officer could have relied upon it.

(DE #36 at 10-11.) This argument presents, of course, a conundrum. If the WCOTC documents and records seized did not contain relevant "evidence of a plot against Judge Lefkow's life" that was useful at trial, the failure to seek suppression of that evidence would cause no prejudice, and so could not be the basis for an ineffective

assistance of counsel argument. Rather than delving into this riddle, this court states only that it believes, as explained above, that evidence that Hale was maintaining property which violated Judge Lefkow's order was potentially relevant to his motive: relevant enough, in the very least, so that reasonable officers executing the warrant would not lack good faith in believing that the affidavit supplied probable cause to seize the items as evidence.

In summary, for all of the reasons explained above, the court does not believe that Hale can establish that a motion to suppress evidence would have been meritorious. Therefore, his defense counsel's failure to file that motion was not ineffective assistance because it caused no prejudice, and it is unnecessary to address part (d) of Hale's argument, asserting that suppression of the evidence likely would have produced a different verdict.

4. *"Trial Errors" [Hale's II.B.4]*

In subpart (a) of this argument, Hale asserts that his attorney was ineffective for failing to object to the admission of the Court of Appeals' opinion reversing Judge Lefkow's decision in the civil trademark litigation; for failing to object to a line of questioning based on a portion of that opinion; and for failing to request a limiting instruction relating to that line of questioning. Specifically, the opinion contained a parenthetical statement that a change in the name and structure of the WCOTC was

"part of a judgment-proofing strategy after a court held in 1994 that Klassen's[32] organization must pay damages for orchestrating a murder." *TE-TA-MA Truth Foundation-Family of URI, Inc.*, 297 F.3d at 664; DE #18 at 37.) Hale argues that this allowed an unfairly prejudicial inference that Hale's church had a habit of soliciting murders, which was then exacerbated by the government's line of questioning related to judgment-proofing, conflating the two entities and implying that Hale's WCOTC had "sponsored," a murder; and by defense counsel's failure to request a limiting instruction that the acts of Klassen's organization could not be considered against Hale.

As the government has pointed out in its response, defense counsel did object to the use of the opinion during trial. (Tr. Vol. 4 at 113-116.) The decision not to request a limiting instruction, which would also have had the effect of emphasizing the objectionable portion of the opinion, was clearly a strategic decision which this court will not second-guess in the guise of ineffective assistance of counsel. *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996) (if lawyer cannot stop admission of evidence, "it is perfectly rational to decide not to draw further attention to it" by requesting a limiting instruction).

As trial error (b), Hale argues that his defense counsel introduced into evidence, and read extensively from, the WCOTC's two "bibles," which contain prejudicial and

---

[32] Ben Klassen was the founder of the Church of the Creator, Inc., a forerunner organization to the WCOTC. It should be noted, significant to Hale's argument here, that the parenthetical statement continued: "Klassen committed suicide in 1993, and Matt Hale became "Pontifex Maximus" of the reconstituted organization in 1996." Thus, the opinion itself created a distinction between the two entities.

inflammatory terms and passages, some of which were read to the jury, such as one calling for the "Elimination of the Black Plague." (DE #18 at 37). Little more need be said than to quote the government's response to this argument:

> This argument is particularly ironic because trial counsel used these writing during the cross-examination of the government's witness, Jon Fox. At the conclusion of the trial, the jury acquitted Hale of the conduct substantially premised on Jon Fox's testimony. Trial counsel's strategic decision to use these writings to impeach Fox were [sic] successful. Defendant's *post hoc* argument as to the reasonableness of trial counsel's strategy call cannot be the basis for an ineffective assistance of counsel claim.

(DE #30 at 19.) Hale's argument in reply is that "whatever extremely dubious impeachment value the books had regarding Fox was vastly outweighed by their prejudicial effect." (DE #36 at 11.)

This largely misses the point. Assessing the weight of the impeachment value of the books against Fox versus their potential to cause prejudice is exactly the type of subjective judgment that goes to the heart of strategic decision-making. Because the decision was not so misguided that no competent attorney would have made it (in fact, it may have had a decisive effect in the jury discounting Fox's testimony),[33] second-

---

[33] Whether or not the impeachment value of the books was "dubious," defense counsel's impeachment strategy in regard to Fox appears to have been highly effective. In initial government interviews, Fox mentioned that he remembered when and where Hale had solicited him to commit acts of violence, because he and Hale were walking down the street at the time and a FedEx truck pulled up with a package for Hale. The government later obtained FedEx records showing a delivery had occurred when Fox said it did. Despite this corroborating detail, the jury apparently did not believe Fox's testimony.

guessing that judgment cannot be done to conclude that there was ineffective assistance. *See United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002) (presumption of effectiveness is not overcome by Monday-morning quarterbacking of trial tactics that were rationally based).

In subpart (c), Hale argues that his attorney was ineffective for not asking for a limiting instruction on evidence concerning the Ben Smith shooting spree, despite four inquiries by the court whether one was wanted. The court also recognized, during trial, that there was a strategic reason why defense counsel might not want that limiting instruction, so as not to emphasize the evidence. (Tr. Vol. 6 at 187.) In reply, Hale argues that while that strategic decision might be appropriate if viewed "in a vacuum," when placed in the context of other evidence the jury heard at trial (for example, the evidence discussed above that the Klassen-founded predecessor to the WCOTC had "orchestrated a murder"), the unreasonableness of the decision is obvious. Again, this is nothing more than an argument that, in hindsight, Hale disagrees with his trial counsel's strategic decision. It does not persuade the court now that a strategic decision not to call additional attention to this evidence via a limiting instructions was objectively unreasonable.

In subpart (d), Hale argues that his attorney's performance fell outside the wide range of professional competence when defense counsel elicited testimony from government informant Tony Evola that another person, named John Yonkers, had told Evola that Hale had solicited him (Yonkers) to "do what Ben [Smith]" had done.

Surprisingly, the government objected to this presumably damaging (to Hale) testimony on the grounds that it was hearsay and being used as an improper method to impeach Evola. (Tr. Vol. 7B at 106.) This objection was discussed at a sidebar, during which defense counsel gave a lengthy explanation of his strategy in eliciting the testimony: he intended to use it to argue to the jury that Evola had made the statement up, in order to ingratiate himself with the government and ensure his continued use as an informant, and it was part of a pattern of deliberate deception by Evola, culminating in his attempting to persuade Hale to take violent action against Judge Lefkow, rather than the other way around, as charged in the indictment. *(Id*. at 107-114.) When the court sustained the government's objection (*Id*. at 115), defense counsel had the court reporter read back exactly what Evola had said on the witness stand, and decided not to have the court strike it and tell the jury to disregard, so as not to call attention to it. (*Id*. at 116-117.)

Hale argues that his attorney's performance is comparable to defense counsel's in *White v. McAninch*, 235 F.3d 988 (6th Cir. 2000), a case involving a prosecution of White for engaging in oral sex with his underage stepdaughter. After the prosecution brought out evidence of an uncharged act of intercourse, White's defense counsel—who did not object, and never asked for a limiting instruction—adduced extensive additional details about the alleged incident, and then spent time during his closing arguing that the circumstances showed that the victim was lying. After remarking that the label "strategy" can't be used as a "blanket justification" to excuse ineffective assistance of

54

counsel, and that even deliberate trial tactics can be ineffective assistance when they "fall outside the wide range of professionally competent assistance," *Id.* at 995 (internal quotations and citation omitted), the court affirmed the trial court's finding of ineffective assistance.

There is a significant difference between defense counsel's performance in *White* and that of Mr. Hale's, which amounts to the difference between ineffective, and effective, representation. As the court explained in *White*:

> [T]here was nothing in the record to suggest that [defense counsel] McCrae was aware of the uncharged act of sexual intercourse before the trial. Moreover, he seemed totally unaware of the fact that there were a number of witnesses who would corroborate the victim's story. Although McCrae met with White and White's father several times prior to trial, there is no evidence that either of these men gave McCrae any information about the uncharged act. . . . McCrae did not conduct formal discovery, and the record does not show that White's meetings with the assistant prosecutor produced any information about the uncharged act. Finally, McCrae did not review prior to trial either the victim's or Angela Kemper's videotapes, both of which discussed the uncharged act.
>
> McCrae's woefully inadequate trial preparation renders it highly implausible that he developed his theory that the victim was lying about the uncharged act, and thus, the numerous episodes of oral sex as well, prior to trial. Indeed, a review of the trial record reveals that a much more likely scenario is that McCrae first learned of the victim's allegations with regard to the uncharged act when she answered the prosecutor's question about any activity other than fondling between her and White in the affirmative. McCrae, who was unable to explain why he failed to object to the prosecutor's question, appears to have been taken quite by surprise by the victim's response. Abandoning his tactic to "ambush" the victim by not reviewing her videotape prior to questioning her, McCrae sought leave to review the videotape of her interview with Pratt and Kemper immediately after the State had completed its questioning of the victim. Upon reviewing the tape, McCrae realized that the victim had informed Pratt and Kemper of the incident. Rather than request a limiting instruction with regard to the uncharged act after reviewing the tape,

McCrae immediately began his cross examination of the victim. Thus, he seems to have formulated his "strategy" to persuade the jury that the victim was lying about the incident in the few minutes between reviewing the tape and beginning cross examination.

*Id*. at 996. This is not like the present case, because defense counsel here did not come up with a fly-by-the-seat-the-pants strategy based on a surprise at trial. Instead, while attempting to overcome the prosecution's objection to his attempted use of the testimony, counsel explained that the defense team had listened to hours of tape recordings and could find nothing to corroborate that what Evola was saying was true (Tr. Vol. 7B at 113), and explained exactly how he intended to argue to the jurors that they should infer that Evola had made Yonkers' statements up.[34] Far from being unprepared to deal with unanticipated damaging testimony, counsel's move was a calculated strategy that had been thought about in advance, not a tactic that is outside the wide range of professional competence.

Finally, in subpart (e), Hale argues that his attorney was ineffective when he neither objected, nor asked for a mistrial, after the Assistant United States Attorney stated during his closing argument that the government "had evidence that the defendant had a member of his organization kill two people and shoot lots of others,"

---

[34] Counsel explained that, in addition to Evola's motive to ingratiate himself with the FBI, Evola apparently made up at least one other damaging item about Hale, before he was being taped (Tr. Vol. 7B at 109); the government was not calling Yonkers at trial to testify as to what Hale had said (*Id*. at 108-109); the government never tried to tape Yonkers himself on the issue (*Id*. at 111); and the government never had Evola try to get Hale to talk, while being surreptitiously recorded, about what he supposedly had said to Yonkers. *(Id*. at 113.)

and attempted to inflame the jury's passion reciting passages from *The White Man's Bible* justifying he use of terrorism.

As to the government's reading portions of *The White Man's Bible*, Hale argues that doing so to imply that he also favored terrorism was an "improper attempt to inflame the jury through an appeal to passion in light of the actual, ongoing war against terrorism." (DE #18 at 39.) In e-mail messages and other communications with members of the WCOTC, Hale used terms such as "RAHOWAH" (an acronym for racial holy war), informed his followers that Judge Lefkow's order in the trademark litigation had created a "state of war" with the WCOTC, and himself quoted *The White Man's Bible* to remind his followers that it taught:

> Should the Jewish Occupational government use force to violate our Constitutional rights . . . then we have every right to declare them as open criminals violating the Constitution and the highest law of the land. They then obviously are the criminals, and we can then treat them like the criminal dogs they are and take the law into our own hands. . . . We must then meet force with force and open warfare exists. It will then be open season on all Jews.

(Tr. Vol. 5 at 40.)

Throughout the trial Hale maintained, as he does now, that the "state of war" he was declaring was meant to be a legal, peaceful war engaged in through use of the courts, protest and the dissemination of information, and that *The White Man's Bible* was harmless rhetoric. (*See, e.g., Id.* at 41 (asking witness Burnett whether he agreed that *The White Man's Bible* and other writings by Klassen were "primarily nonsense.")) The government's use of the portions of *The White Man's Bible* which Hale argues was

unfairly inflammatory was not: it was fair use of the evidence to shed light on what

Hale's use of terms such as war and other communications with his followers, including

Evola, were intended by him to mean.

Because this was proper use of the evidence, Hale's defense counsel's failure to

object caused him no prejudice. Moreover, counsel did not simply ignore the

government's use of these passages. Instead, to counteract the government's tactic,

defense counsel requested that a final jury instruction be given based on *Brandenburg v.

Ohio*, 395 U.S. 444 (1969). (Tr. Vol. 11 at 163-64.) This resulted in the court modifying

final instruction 31. (*Id*. at 166-67.) It is presumed that jurors follow the court's

instructions, *Emerson*, 501 F.3d at 813, and this action by defense counsel was sufficient

to address Hale's concern.

As to the government's statement that it "had evidence that the defendant had a

member of his organization kill two people," it is not surprising that there was no

objection. As the court explained in ruling on post-trial motions, in the context of

closing argument "had" wasn't understood to mean "caused." Instead, the phrase

"defendant had a member of his organization kill two people" appears to have been

taken in context to mean that something happened, not that Hale caused it to happen:

as the court explained previously, it was understood like the statement "I had a flat tire

on the drive home." Nevertheless, however the remark was understood, and whatever

the government might have meant for the remark to mean,[35] the Court of Appeals found that the remark, although improper, caused no prejudice, primarily because the record showed that no one in the courtroom noticed the remark (that is, understood it as a statement that there was evidence that Hale had directed Smith's conduct); the remark, in its entire context, emphasized Hale's reaction to Smith's shooting spree, not alleged involvement before the fact; and finally, it was an isolated remark, while the evidence against Hale was considerable. *Hale*, 448 F.3d at 987-88.

Hale argues now that the Court of Appeals applied the stringent plain error standard to arrive at its finding that no prejudice resulted, but that in the present proceeding the court should recognize the remark's impact in light of the cumulative effect of all of the other errors he has shown that his defense counsel made. As this court had endeavored to explain herein, it does not agree with Hale's laundry list of errors, and believes that defense counsel did an excellent job in a case with extremely difficult facts. Thus, there is no greater cumulative impact to consider, and no prejudice resulted from the remark, which means that defense counsel's failure to object caused no prejudice. In addition, if defense counsel had objected, the Court of Appeals' explanation why prejudice did not result encapsulates why a motion for mistrial would not have been granted, and why the outcome on appeal would have been no different.

---

[35] The government's explanation for this remark has been equivocal. *Hale*, 448 F.3d at 986-87. In its response to Hale's § 2255 motion, the government states that its prior explanations should have been "more direct," and that the statement was an unintended slip of the tongue. (DE # 30 at 20-21 n. 16.)

Thus, Hale cannot demonstrate that his attorney's failure to object to the improper remark caused him any prejudice.

5. *"Jury Selection Errors" [Hale's II.B.5]*

Hale argues that it was unreasonable for defense counsel to fail to strike a single African-American juror—while striking several Caucasian jurors—knowing that the trial would be permeated by evidence of Hale's white supremacist beliefs:

> At a minimum, counsel should have explored any possible prejudice of the African-American jurors but they did not even do this.
> While it is commonly believed that African-American jurors are more sympathetic to criminal defendants and thus preference for African-American jurors may fall within the bounds of a reasonable trial tactic, such a tactic by Mr. Hale's counsel was profoundly ***unreasonable*** considering the circumstances of ***his*** case.

(DE #18 at 40.)

However, the court's *voir dire* of the prospective jurors—which did incorporate the substance of many questions submitted by defense counsel (Tr. Vol. 1A[36] at 19-20; 278-282)—was thorough and careful, and designed to ferret out whether any of the prospective jurors, African-American or otherwise, harbored biases or prejudiced beliefs which could not be put aside. To give only a few examples, the court inquired whether any of the jurors would be offended by evidence that Hale called his racist belief system a religion, or if any had strong feelings or beliefs about race or racial prejudice (Tr. Vol. 2 at 110); whether evidence that Hale had strong negative feelings

---

[36] The court will use "Vol. 1A" to refer to the transcript of the proceedings conducted on the morning of April 7, 2004. The transcript itself does not contain a volume number.

about racial and religious minorities would keep them from being able to impartially

judge the case based on the facts in evidence (*Id*. at 112); and whether any of them, or

anyone close to them, had ever been victimized, or treated differently, on account of

their race, gender, sexual preference or religion. (*Id*. at 113.)

Hale hasn't shown anything suggesting that any of the African-American jurors

who were selected could have been challenged for cause, and in the absence of some

specific showing that any of them were biased or prejudiced, Hale is criticizing his

defense counsel for doing exactly what the Constitution of the United States forbids:

using peremptory challenges to discriminate solely on the basis of race.[37] *Georgia v.*

*McCollum*, 505 U.S. 42 (1992); *Batson v. Kentucky*, 476 U.S. 79 (1986). As the government

observes in its response, doing what the law requires cannot be the basis for an

ineffective assistance of counsel claim. *Cf. United States v. Evans*, 92 F.3d 540, 544 (7th

Cir. 1996) ("The refusal to act unethically by making a groundless argument can never

be a ground for arguing ineffective assistance of counsel.")

---

[37] Hale goes so far as to assert: "If discrimination against African-American jurors in a trial involving an African-American defendant is constitutionally suspect, so too should it be constitutionally suspect for a white defendant's lawyer to discriminate against white jurors in favor of African-American jurors." DE #18 at 40. The problem is, there is no record support for showing discrimination against white jurors by Hale's counsel. Whether it is true or not that Hale's counsel preferred black jurors, indulging that preference by *not* exercising peremptory challenges is not the same as discriminating against white jurors. This is particularly true where Hale has not pointed to any specific example where it would appear that a white juror was challenged for no reason other than race.

The only juror as to whom Hale makes a specific argument was a Caucasian, ironic, given that Hale's main argument is that there weren't enough Caucasians on the jury. Hale argues that M.H.[38] should have been challenged for cause or peremptorily because: 1) he stated that he thought he had heard that "Smith said something like he was told to go do what he had done;" 2) he had an African-American domestic partner; 3) he was an Assistant Dean at Northwestern University, where Smith's murder victim had been a basketball coach; and 4) he was a resident of West Rogers Park, "the same town where Smith had committed his shooting spree." (DE #18 at 40.) Hale argues that the failure to challenge biased jurors is constitutionally-deficient performance. See *Virgil v. Dretke*, 446 F.3d 598, 609-11 (5th Cir. 2006).

None of the facts Hale enumerates regarding M.H. necessarily show bias, and some additional information bearing on M.H.'s statements is illuminating. West Rogers Park is not a town, it is a neighborhood in the City of Chicago. Ben Smith did shoot and wound several persons in this neighborhood, in July, 1999, but juror M.H. did not move to that neighborhood until approximately 2002, three years after the shootings took place. (Tr. Vol. 2 at 69.) In fact, he moved from New Hampshire to the Chicago area, and began working at Northwestern University, in August, 1999, one month after Smith's shooting spree. (*Id*; Tr. Vol. 1 at 223.) He explained:

> [M]y partner and I had heard about the incident on the newspaper. But
> being from out of town, we really didn't understand what was going on,

[38] The court uses initials herein for jurors and members of the venire to minimize the impact to their privacy.

and we didn't focus a lot on the news because we were busy looking for a place to live. . . . But then in August , I moved down here and by then I started working at Northwestern University. So I've worked there since August of '99 and heard about it from working on campus.

(Tr. Vol. 1 at 224-225.) When the court asked M.H. whether he had ever formed, or expressed any opinion, about Smith's shooting of the basketball coach, he answered, "I didn't know him and I was from out of town, so I didn't really have a lot to think about." (*Id*. at 226.) He told the court he thought that he could put aside everything he had heard outside the courtroom and any opinion he might have formed, base his verdict on only the evidence at trial, and render an impartial verdict. (*Id*. at 227-228.) In answer to the question whether any juror had "any strong feelings and beliefs about race and racial prejudice," M.H. stated:

> I'm not exactly sure how to answer that question, but my partner's African-American, but I believe people can hold what opinions they have, it just depends on what those opinions are. I think that's something you should know, but I don't know that it would affect me, I don't think.

(Tr. Vol. 2 at 110.) The court then asked him if that would prevent him from impartially judging the facts of the case, and he answered: "I don't believe so." (*Id*. at 111.)

Based on the forgoing, Hale hasn't shown that juror M.H. had any actual bias, and thus there was no basis for defense counsel to challenge M.H. for cause. Had any such challenge been made, if made would have been overruled.

As for the failure to use a peremptory challenge, while the *Strickland* standard is already highly deferential to a lawyer's strategic decisions, particular deference is given to *voir dire* strategy, and a decision made then will not serve as the basis for an

ineffective-assistance claim unless it "is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001); *see Nguyen v. Reynolds,* 131 F.3d 1340, 1349 (10th Cir. 1997). M.H. was in the first group of 12 prospective jurors. For that first group, defense counsel used four of his available ten peremptory challenges (Tr. Vol. 2 at 166-67), striking, for example, prospective juror D.S., who worked for the DuPage County Sheriff's Department (*Id*. at 81); and D.S, whose son was beaten severely enough that he needed stitches, for the reason that he had red hair. (*Id*. at 166-67). The court cannot conclude that it was an ineffective strategy at that point to hold six peremptory challenges in reserve, *cf. Gardner v. Ozmint*, 511 F.3d 420, 426 (4th Cir. 2007), to leave on the jury a highly-educated and presumably "liberal" person who might be open to Hale's entrapment defense. Given juror M.H.'s assurances that he could be fair and impartial, his presence on the jury didn't infect the "entire trial with obvious unfairness," and Hale's defense attorney was not ineffective for not removing him.

6. *"Violation of Mr. Hale's Right to be Present For and Participate in All of Voir Dire"* [Hale's II.B.6]

Prospective jurors who indicated that they had prior knowledge of facts related to the case were individually asked additional questions in a small conference room adjacent to the courtroom. The court's main reason for using this procedure was so that their answers would not taint the rest of the jury pool. Hale was not present during this individual questioning, and he now argues that his counsel was ineffective for failing to

object to that exclusion, which itself, he argues later as an independent claim, violated his rights under the Fifth Amendment and Fed. R. Crim. P. 43(a). Although the substantive merits of that claim would bear on his ineffective-assistance claim (if meritless, the ineffective-assistance claim based on it fails for lack of prejudice), the court postpones consideration of the merits here, continuing to track and address Hale's arguments in the order he makes them.[39]

As to his attorney's failure to object to this exclusion, in point of fact, his counsel agreed with the decision to conduct *voir dire* in this fashion, waiving Hale's presence. (Tr. Vol. 1A at 41-42.) It appears counsel did so after discussing the matter with Hale: as Hale states in his brief supporting his motion, his attorney informed the court "Mr. Hale had asked whether I thought he should come here. I said I would report back. I said I thought it okay if he was not here." (*Id.*) No further discussion of the matter occurred. Thus, Hale, who himself is an attorney, is complaining about a decision he appears to have acquiesced to, despite his assertion now that he did not consent. (DE #8-3 at 13-14 ¶ 23.) Suggesting that Hale in fact did agree with his attorney to waive his presence, the record shows that when he disagreed with his attorney's decisions, he made that known to the court. For example, he addressed the court personally regarding his concern that more peremptory challenges were needed to exercise against African-American venire members. (Tr. Vol. 3 at 24-27.)

---

[39] Hale uses the ineffective-assistance aspect of his argument in part to explain why he didn't raise the underlying claim on direct appeal, to avoid this procedural default.

Moreover, there was an obvious strategic reason for that decision. If Hale had been present, sitting literally a few feet from the potential jurors, it is unlikely that they would have spoken with the same candor. For example, prospective juror M.F. stated "I am substantially biased against people claiming to be white supremacists based upon my heritage" (Tr. Vol. 2 at 78); prospective juror B.C. stated "I just don't care for Mr. Hale. . . .  I have a very bad opinion of Mr. Hale, let's put it that way" (Tr. Vol. 1 at 198); and prospective juror N.A., with no prompting, blurted out: "Can I make a statement now? He's probably a racist pig, but that's beside the point." (Tr. Vol. 1 at 246.)

This is not to say that it would have been proper for Hale's attorney to waive Hale's right to be present during this portion of voir dire without Hale's knowledge and agreement, only that there was in fact a good reason for Hale to think it better that he be absent from the in-chambers *voir dire*, and waive his right to be present. Thus, he cannot base an ineffective-assistance claim on the supposed lack of an objection to his exclusion, where his attorney waived Hale's right to be present, and the record indicates that Hale consented to that decision.

 Hale's knowledge that a portion of the *voir dire* was being conducted outside his presence, and apparent consent, is what differentiates this case from *United States v. Rodriguez*, 67 F.3d 1312, 1316 (7th Cir. 1995), which Hale cites in his reply brief. In *Rodriguez* the defendant was not present during several conferences in which questions, sent to the judge by the jury during deliberations, were answered. The government argued that his attorney's failure to object was a waiver, but the Court of Appeals stated

that "a purported waiver by counsel is not adequate to effect a waiver," immediately

following that observation by noting that the "record suggests no waiver by

Mr. Rodriguez, who was in custody during the deliberations." *Id*. (Although the court

in *Rodriguez* contacted counsel when the notes were received, the record did not

indicate that the defendant was present or made aware of the notes. *Id*. at 1315-16.)

Hale, on the other hand, was in the courtroom able to personally observe each

prospective juror exiting for *in camera* follow-up questions, and the record indicates that

he and his attorney discussed whether or not he should be present. Thus, the record

does suggest he himself waived his right to be present.

In arriving at the conclusion that Hale's attorney was not ineffective, it must be

noted that Hale's argument is limited to the assertion that his attorney was ineffective

*for failing to object to his exclusion*. In his affidavit in support of his motion, he does state

that this portion of the *voir dire* was held outside his presence "without my consent"

(DE #8-3 at 14 ¶ 23), but in his reply brief in support of his motion he does not argue

that he insisted to his attorney that he wanted to be present, and his attorney rejected

that request, but only that the court failed to obtain his personal consent, on the record,

to his absence. Thus, it is not clear what he means by "without my consent." He never

directly states that he told his attorney to insist to the court that he wanted to be

present, and that his attorney refused to do so, and that failure means that Hale has no

claim. *Taylor v. United States*, 287 F.3d 658, 661-62 (7th Cir. 2002). On the flip-side of the

coin, if he does obliquely mean that he told his attorney he refused to consent, but his

attorney failed to abide by that request and make an objection, the court thinks that this is an after-the-fact-contradiction of the record (there is no reason to think that defense counsel would raise the issue with the court, then simply drop it if his client didn't agree to waive his presence) which doesn't gain traction. *Cf. United States v. Boyd*, 86 F.3d 719, 722-23 (7th Cir. 1996) (post-trial objection that client didn't agree with his lawyer's peremptory challenge of juror too facile to be allowed to succeed). Nevertheless, in the interest of completeness, the court  considers the merits of this opaquely-made argument.

First, Hale's argument in his reply brief (DE #36 at 13-14), is that the real problem is that the court didn't address him personally and put his waiver of his right to be present on the record. This assertion can be quickly dispensed with. Hale's authority for the proposition that the court was required to do so is *United States v. Gordon*, 829 F.2d 119, 122-24 (D.C. Cir. 1987). *Gordon* is not consistent with the law of this circuit. *Boyd*, 86 F.3d at 723-24 (7th Cir. 1996). In this circuit, the court need not use that procedure even for a defendant's waiver of the right to testify. *United States v. Stark*, 507 F.3d 512, 516 (7th Cir. 2007); *Taylor*, 287 F.3d at 658.

If Hale told his attorney he wanted to be present during the in-camera portions of *voir dire*, and his attorney ignored that instruction, the familiar *Strickland* analysis applies: that is, Hale must show that his attorney's doing so fell below an objective level

of competence; and that the failure caused Hale prejudice.[40] Although the court has not

found a case explicitly saying so, it will assume that the first prong of the test is met. A

defendant's presence at every critical stage of the trial is a right rooted in the Fifth and

Sixth Amendments to the United States Constitution, *United States v. Gagnon*, 470 U.S.

522, 526 (1985), and therefore appears to be one of the "core" rights, like the decision to

testify, that must be made personally, and cannot be waived by defense counsel without

the client's consent. *See Rodriguez*, 67 F.3d at 1316 ("a purported waiver by counsel [of

right to be present] is not adequate to effect a waiver").

But at the prejudice step, Hale's claim necessarily fails. His argument is directed

entirely at juror M.H., as to whom he argues:

> If my attorneys . . . had informed me prior to not challenging [M.H.] as to
> what venireperson [M.H.] had stated to the Court and counsel in private, I
> would have insisted that M.H. be challenged for cause, and if the
> challenge for cause had not succeeded, I would have insisted that he be
> peremptorily excused.

(DE #8-3 at 14 ¶ 24.)

As explained above, there was no basis on which to challenge M.H. for cause,

because he stated that he believed that he could put aside knowledge about the case,

and opinions formed, outside the courtroom, and render an impartial verdict based

solely on the evidence at trial. (Tr. Vol. 1 at 227-28.) Whether Hale believes now that he

---

[40] It appears that even when an attorney's error causes a defendant to forego a
constitutional right that must be decided upon personally, that does not constitute
ineffective assistance unless the defendant shows a likely impact on the result. *See
Rodriguez*, 286 F.3d at 985 (waiver of right to testify); *Barrow v. Uchtman*, 398 F.3d 597,
608 n. 12 (7th Cir. 2005).

would have insisted that M.H. be peremptorily removed is of no consequence, because the decision whether or not to use a peremptory strike belongs solely to counsel, *Boyd*, 86 F.3d at 723, and so counsel could have ignored Hale's insistence. Reviewing jury selection as a whole, it is obvious that counsel was making strategic decisions as to whom to challenge, and did not fail to eliminate M.H. through inattentiveness. Moreover, whether or not counsel might have changed his mind with Hale's input, and used a peremptory strike against M.H., Hale hasn't shown that leaving M.H. on the jury resulted in a jury that was more likely to convict an innocent man. Thus, he cannot establish the prejudice element necessary under Strickland for an ineffective-assistance claim. *Boyd*, 86 F.3d at 722.

### 7. "An Inadequate Closing Argument" [Hale's II.B.7]

The crux of Hale's argument is that he was "prejudiced by counsel's failure to argue his strongest and best defense, and to argue the facts which supported this defense." (DE# 18 at 43.) Thus, the specifics of this argument go to Hale's theory, already discussed and rejected above, that his attorney should have been arguing that Hale understood Evola to be proposing the murder of one of the attorneys, not of Judge Lefkow, that Hale therefore never agreed to any plot that Evola was hatching against the Judge, and that Hale rejected Evola's plans when he realized Evola meant Judge Lefkow.[41] For the reasons explained above, the court does not believe that counsel's

---

[41] Of course, this assumes that Evola was the one proposing the scheme, the heart of the entrapment defense which Hale used. Viewing the evidence most favorably to the government, however, a reasonable jury could, and did, find that Hale inveigled Evola.

decision to pursue a different defense can be characterized as ineffective assistance. Therefore, choosing to emphasize points germane to that defense during his closing argument was also not ineffective.

### 8. "Failure to Prepare Mr. Hale to Testify at Trial" [Hale's II.B.8]

Simply put, it cannot be ineffective assistance for a lawyer to fail to prepare his client to testify, if the client has decided not to testify. In this case, although not required by the law of this circuit, Hale executed a written waiver of his right to testify (1:03CR11 DE #147), and the court examined Hale to make sure that he had done so freely and voluntarily, after discussing with his attorneys all the benefits and detriments of testifying or of not testifying. (Tr. Vol. 10 at 34-36.) His counsel then explained that Hale in fact wanted to testify, but as to certain counts only,[42] and was choosing not to testify only because, since those counts had not been severed,[43] that would be impossible and his testimony posed substantial risks. (*Id*. at 36-40.) Counsel then moved to bifurcate the counts for separate consideration so that Hale could testify (*Id*. at 39), which motion was denied. (*Id*. at 40.) This effort to make it possible for Mr. Hale to testify rather conclusively demonstrates that there was no ineffective assistance of counsel caused by a supposed failure to prepare him to do so.

---

[42] Counsel informed the court that Hale wished to testify regarding Counts 1 and 5 only. (Tr. Vol. 10 at 36.) The jury's verdict on Count 5 was vacated as the result of one of Hale's post-trial motions, so any prejudice he may have suffered would be limited to the verdict on Count 1.

[43] *See* 1:03CR11 DE #85, denying motion to sever Counts 1 and 4. Count 4 later became Count 5 in third superseding indictment.

Hale argues now, however, that the *only* reason he chose not to testify (presumably, in regard to all of the counts, not just to two of them) was that his attorney had not prepared him to do so. It staggers the imagination that Hale, an attorney, who showed no hesitation in informing the court that he disagreed with his attorney on peremptory challenges and wanted more of them, would not have raised this issue during the court's colloquy with him concerning his waiver of his right to testify. Hale's explanation now that he wanted to testify, but didn't because his lawyer failed to prepare him, is simply "too facile" to avoid his explicit waiver. *Boyd*, 86 F.3d at 722-23; *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991).

Perhaps recognizing this problem, in his reply brief Hale skews his argument slightly. Abandoning the focus on his attorney's failure to prepare him to testify, he maintains that the waiver itself is not the issue, "but rather, the errors of counsel that prompted it" (DE #36 at 13), and argues that the real problem is that his attorney's advice on the matter was so deficient. *See Starkweather v. Smith*, 574 F.3d 399, 403 (7th Cir. 1999) (incorrect advice that induces a defendant to waive right to testify can constitute ineffective assistance). It was deficient, Hale believes, because: 1) his attorney didn't understand the facts of his case, that is, that the evidence showed that Hale didn't understand that Evola was referring to Judge Lefkow, which should have been used as the basis of his defense; and 2) the harm his attorney was worried about—that the jury would learn about his racist beliefs—had already been done because defense counsel

"had, remarkably, read from and admitted into evidence the two books embodying his beliefs." (DE #36 at 12.)

The latter half of this contention ignores some of the facts: what defense counsel said was that Hale's testifying "would open him up to cross-examination about his beliefs and *a lot of horrible things that he has said in the past, some of which you didn't permit the government to put in in their case in chief.*" (Tr. Vol. 10 at 38 (emphasis added).) Other than matters on which there were evidentiary rulings, it is impossible to know what all of that evidence might have been, but Hale's defense counsel did know. Moreover, assuming it was in the same, or worse, tenor as the information of which the court is aware that was kept out of the jury's purview, it was a wise decision.

The first half of the contention is another variation on Hale's theme that his counsel didn't use the best defense, which, for the reasons the court has explained throughout this order, simply doesn't withstand scrutiny. In short, Hale hasn't identified any facts suggesting that his waiver resulted from ineffective assistance, therefore, his waiver of his right to testify is conclusive.

*9. "Breach of Duty of Loyalty to Mr. Hale" [Hale's II.B.9]*

Hale argues that by making comments to the jury such as that Hale was a "jerk" and referring to his beliefs as "filth" with a "lack of moral basis," his attorney displayed animosity to him which "added fuel to a jury that was already unsympathetic and antagonistic to Mr. Hale due to his beliefs,' and that when "his own counsel showed no respect for him" it had to have had a negative impact on the jury causing Hale

73

prejudice. In the court's view, no argument which Hale makes is more contrary to the reality of his counsel's performance than this one.

If the jury had thought Hale had found a kindred spirit to defend him, that undoubtedly (in light of the beliefs the jurors expressed during *voir dire*) would have caused them to cast a jaundiced eye on the entire defense, and any chance of acquittal would have been nil. Instead, the jury had to understand that Hale's attorney was acting as a professional, and asking them—as he did—to judge Hale based not on Hale's beliefs and morality (or lack thereof), but solely on the basis of whether the government had proved its case beyond a reasonable doubt. Under the circumstances, rather than having a negative impact, counsel's self-illustrative argument to the jurors that they needed to put their dislike for Hale aside appears to have been effective: if the jurors decided the case based solely on prejudice against Hale, it does not seem they would have found him not guilty on one of the solicitation counts. The court believes that, in light of the negative feelings nearly every juror revealed during *voir dire* about Hale's beliefs, his attorney's choice to admit that those beliefs are despicable, but not a basis for judging and convicting Hale, was an effective tactic, not ineffective assistance.

*C. Cumulative Effect of Counsel's Errors [Hale's III.C.]*

As a separate section of his memorandum, Hale argues that the cumulative impact of all of the "errors" discussed above "was so substantial and injurious that they affected Mr. Hale's substantial rights and undermined and infected his right to a fair and reliable trial and, therefore, cannot be considered harmless." (DE #18 at 32-33.) In

answer to this, the court can only say that ten times zero is still zero. This is not to say that counsel's performance was perfect, but it didn't have to be. "[C]ounsel 'need not be perfect, indeed not even very good, to be constitutionally adequate.'" *McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (*quoting Dean v. Young*, 777 F.2d 1239, 1245 (7th Cir. 1985)). The question to be answered is not "whether counsel's performance was error-free, but rather whether counsel was effective overall." *Gray v. United States*, 341 Fed. Appx. 193 at *3 (7th Cir. 2009). Viewing the performance of Hale's defense counsel cumulatively, this standard was met.

## II. Violation of the Right to Be Present at All Critical Stages of the Trial [Hale's IV]

As his second ground for relief pursuant to § 2255, Hale argues that his rights under both the Fifth Amendment of the Constitution of the United States and Fed. R. Crim. P. 43(a) were violated when he was excluded from the portion of juror *voir dire* dealing with the potential jurors' exposure to pretrial publicity. Hale asserts that his failure to raise this claim on his direct appeal is of no consequence because he has demonstrated that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998). In addition, in an amendment to his motion made on August 12, 2009 (DE #37), Hale argues that the violation of his right to be present is a "structural error" which requires an automatic reversal without any analysis as to whether the error caused him harm.[44] *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

---

[44] In his initial motion, Hale argued that a harmless-error standard applied.

The first defect with this argument, stopping it dead in its tracks without the need of extended analysis, is already stated above. In the court's discussion of this issue in connection with the ineffective-assistance claim Hale bases on it, the court explained why it believes that the record demonstrates that Hale waived his presence. Hale was not "excluded" from any portion of voir dire. Instead, his attorney, with Hale's obvious acquiescence, waived Hale's presence. That means that the only way the claim can be raised is under the rubric of ineffective assistance of counsel, because "steps the court takes at the defendant's behest are not reversible, because they are not error; even the "plain error" doctrine does not ride to the rescue when the choice has been made deliberately, and the right in question has been waived rather than forfeited." *Boyd*, 86 F.3d at 722 (citing *United States v. Olano,* 507 U.S. 725, 732-34 (1993)). Thus, because the right in question was deliberately waived, Hale has no Fifth Amendment/Rule 43 claim to assert, and the court rests its denial on this basis.

Alternatively—assuming that the court's opinion that the record shows that Hale waived his right to be present is incorrect—a second waiver of the issue prevents its assertion now. The failure to raise an issue on direct appeal—even one of Constitutional dimension—bars it from being raised in a collateral attack under § 2255, unless the defendant shows either good cause for failing to raise it on appeal, and resulting prejudice, or that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998). In his initial motion Hale argues that he has demonstrated actual innocence, so he need not address cause and prejudice, although he does so briefly in a footnote.

Much later, in his reply to the government's response to his motion arguing that his absence from *voir dire* was a structural error, Hale fleshes out his cause-and-prejudice argument. Although this goes beyond the issue raised by his amendment concerning the standard of review, the government amplified its waiver argument when it responded to Hale's amendment, so the court will consider Hale's additional argument.

First, though, comes the argument Hale makes initially: that he has demonstrated actual innocence. Actual innocence does not mean a legal insufficiency, it means factual innocence, and is shown when a defendant demonstrates that, in light of all the evidence, it is more likely than not that any reasonable juror would not vote to convict. *Bousley*, 523 U.S. at 623. Hale's entire argument on actual innocence is premised on his belief that "had his jury known that Judge Lefkow was not the 'Jew rat' on December 5, 2002, it is indeed more likely than not that no reasonable jury would have convicted Mr. Hale." (DE #46 at 2.) As the court has explained herein, and on multiple prior occasions in this case, it disagrees completely with that interpretation of the evidence, even if the portion of the recording which Hale believes is crucial is understood to read as Hale believes it should. Thus, Hale has not demonstrated that his procedural default is excused by actual innocence, turning the inquiry to whether he can demonstrate cause and prejudice.

Hale argues that the cause for failing to raise this issue on his direct appeal is that he did not have transcripts of the *voir dire*, and that "[w]ithout access to and possession of the voir dire transcripts, Mr. Hale could not have raised this issue on appeal." (DE

#18 at 34 n. 8.) As the government points out (DE #42 at 2), Hale represented himself on

appeal and was obviously aware that he had been "excluded" from *voir dire* (indulging

Hale's characterization of what occurred), yet he chose not to include that issue in his

direct appeal, resulting in waiver.

Hale's reply is that he did not receive copies of the transcripts of *voir dire* until

sometime after June 9, 2005, the day he filed his opening appellate brief (DE #8-3 at 16

¶ 4), and that without those transcripts, he "could not have reasonably been expected to

articulate his argument that he had been absent for a substantial portion of the *voir dire*

proceedings and that his absence . . . had been involuntary." (DE #46 at 3.) Moreover,

Hale argues, had he raised the issue, without the transcripts he would have been unable

to support it with the specificity required by Fed. R. App. P. 28(a)(9)(A), which would

have resulted in waiver.[45]

First off, this is a "Catch-22:" if Hale is correct that a structural error occurred as

to which he need not even show prejudice—the argument he raised which gave him the

opportunity to explain why he needed the *voir dire* transcripts for his direct

appeal—then he didn't need the transcripts to make the argument on his direct appeal.

His argument now is that the record shows that he did not personally waive his right to

---

[45] Whether or not Hale is correct, had he raised the issue on direct appeal he would have a better argument to respond to the procedural default facing him now. Moreover, both of the cases Hale cites (*United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009); *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992)) to support his waiver argument focus on arguments waived because made in conclusory, undeveloped fashion, not because they fail to cite to the record.

be present (which he knew before he had access to the *voir dire* transcripts) and that his exclusion from the process is a structural error entitling him to an automatic reversal, without any need to show that the exclusion caused prejudice. The transcripts, on the other hand, would only be needed to show prejudice: thus, Hale could have raised the issue, and made his argument, without the transcripts.

But even putting this logical circularity aside, Hale offers no explanation why he didn't simply seek an extension of time pursuant to Fed. R. App. P. 26 to file his opening brief, in order to allow him to obtain and review the *voir dire* transcripts first. Actually, Hale does offer an explanation in his reply brief, but it is not a good one: he states that he did not seek the transcripts because he had been told by the attorney representing him during post-trial proceedings that "he was not allowed to have [them]," and whether that was "correct or false, it was legally sufficient cause"[46] for him not to seek to obtain them prior to his appeal. (DE #46 at 3.)

The court disagrees. Hale states in his affidavit that he was told by his attorney that he was not allowed to have the *voir dire* transcripts because they were under seal. (DE #8-3 at 15-16 ¶ 33.) Hale discharged his attorney, and began representing himself, on August 10, 2004, six months prior to filing his notice of appeal. If he believed that his "exclusion" from *voir dire* was an issue that might be important enough to pursue on appeal, he offers no reason why he did not ask the court to lift the seal (and in fact, there

_____

[46] This qualification was necessary because any such advice was in fact incorrect. Only a brief portion of voir dire was under seal, the portion where Hale addressed the court personally to request more peremptory challenges.

was no seal) so that he could order the transcripts. In fact, the court's records show that the transcript volumes containing the *in camera voir dire* were filed with the District Court Clerk on May 25 and June 2, 2005, before Hale filed his opening appellate brief on June 9, 2005.[47] (1:03CR11 DE ##296, 297.) That can only mean that Hale (himself, or through his stand-by counsel, Thomas Gibbons) ordered the transcripts sometime earlier,[48] lending further support to finding that Hale could have requested an extension of the briefing schedule[49] in order to consider those transcripts, and has procedurally defaulted his claim. Finally, Hale also doesn't explain why, after he received the *voir dire* transcripts—presumably before appellate briefing was closed and long before oral argument—he didn't request leave to amend or supplement his appellate brief to include the issue. Under the circumstances, the court finds that Hale has not established cause for his failure to raise the issue of his absence from portions of *voir dire* on his direct appeal, and that procedural default bars him from raising it now.

---

[47] Hale is vague as to when he received the transcripts, stating that it was "sometime after" he filed his appellate brief on June 9, 2005. (DE #8-3 at 16 ¶ 34.)

[48] The copy of the transcript order form that appellant Hale should have filed with the clerk as required by Fed. R. App. P. 10(b)(1)(A)(iii) does not appear on the docket; neither does it appear that the copy required by Fed. R. App. P. 11(b)(1)(A) was docketed in Hale's appeal (No. 05-1922).

[49] Entry #8 on the docket sheet for Hale's appeal (No. 05-1922) indicates that he did request an extension of time to file his opening brief, for the reason that he had been transferred to a new place of incarceration without his legal materials. Entry #9 shows that his request was granted, and he was given until June 16, 2005, to file his brief. Because he is vague as to when he actually received the transcripts, it is unknown whether, if he had waited until June 16 to file his brief, he would have had them before then.

## CONCLUSION

The court does not believe that Hale has alleged any facts that require an evidentiary hearing to resolve Hale's motion seeking to vacate his conviction, therefore, his request for an evidentiary hearing is **DENIED**. For the reasons explained above, Hale's motion to vacate his conviction pursuant to 28 U.S.C. § 2255 (DE #1) is **DENIED**. The court must now issue or deny a certificate of appealability ("COA"), or order briefing as to whether one should issue. Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts. The court **DENIES** the issuance of a COA. A COA should issue only if the movant has made a substantial showing of the denial of a constitutional right, that is, that reasonable jurists would find it debatable whether the district court correctly resolved the issues or would conclude that those issues are adequate to deserve further proceedings. 28 U.S.C. § 2255(d); 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 337-38 (2003). The court believes that the explanation herein for the denial of Hale's motion adequately explains why this standard has not been met. The clerk is directed to enter a final judgment of dismissal.


### SO ORDERED.


Date: July 22, 2010

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT