# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW HALE, | ) | |
|     Defendant-Movant, | ) | |
| | ) | |
|     v. | ) | No. 1:08 CV 94 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Respondent. | ) | |

## OPINION AND ORDER

This matter is before the court on defendant-movant Matthew Hale's motion pursuant to RULE 59(e) of the FEDERAL RULES OF CIVIL PROCEDURE, (DE # 52), requesting the court to reconsider its decision and vacate its final judgment of July 22, 2010, which denied his motion collaterally attacking his conviction via 28 U.S.C. § 2255. The government responded in opposition, (DE # 58), and Mr. Hale filed a reply. (DE # 64). Mr. Hale later supplemented his motion. (DE # 66). The government has not responded to the supplement.[1]

There are only three grounds for a motion pursuant to RULE 59(e): the court may alter or amend a judgment when the movant presents newly-discovered evidence, shows that there has been an intervening change in the law, or demonstrates that the

---

[1] The government may have assumed no response was necessary, because the supplement is in effect an attempt to bring additional evidence in support of his § 2255 motion, after judgment, even though the evidence was previously available to him. In the interest of complete consideration of the issue whether Mr. Hale's motion should be granted (and, if the § 2255 were re-opened, the additional evidence would then be allowed), the court will consider the supplement. See *Rodriguez v. United States*, 286 F.3d 972, 980 (7th Cir. 2002) (although party should have judgment reopened pursuant to RULE 59, then seek to amend, justice may require something less).

court has committed a manifest error of law. *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th

Cir. 2008); *Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998). Mr. Hale's motion falls

squarely in the latter category. In brief, Mr. Hale contends that: 1) the court erred by not

holding an evidentiary hearing, more specifically by a) instead presuming that a

number of decisions made by his defense counsel were based on strategy, and b) not

hearing Hale's testimony supporting his claim he always knew Tony Evola was a

government informant; 2) the court erred by applying the wrong legal standard in

deciding his § 2255 motion; 3) the court failed to understand his argument regarding his

defense attorney's concession regarding the solicitation of the murder of lawyer James

Amend; 4) the court erred in finding that Mr. Hale waived (by not raising it in his direct

appeal) the issue of his absence from portions of the voir dire of prospective jurors; and

5) the court overlooked a transcript of a recorded conversation confirming that Mr. Hale

told government informant Tony Evola that he (Hale) wished that Ben Smith had shot

Hale in the leg, rather than going on a shooting spree targeting minority individuals.

## I. Whether the court erred by not holding an evidentiary hearing

### A. Presumption trial counsel made strategic decisions

Mr. Hale's first argument is that:

The Court erred by repeatedly presuming to know what was on the mind
of defense counsel – whether their thoughts were guided by a reasonable
strategy, an unreasonable strategy, or by ignorance – without holding an
evidentiary hearing to determine through testimony what those thoughts
and strategies or non-strategies were. Without an evidentiary hearing, one
simply does not know why counsel performed, or failed to perform,
many, if not most, of their actions.

(DE # 52 at 3.[2]) He then provides several specific examples of decisions which the court found were reasonable strategic decisions, but as to which he believes he has made enough of a showing to require a hearing to demonstrate that the decisions were either non-strategic, thoughtless errors, or were made for a reason other than a reasonable strategy (for example, animosity towards Mr. Hale).

As an initial matter, Mr. Hale is simply wrong in asserting that this court—or any court reviewing a § 2255 motion—errs by "presuming to know what was on the mind of defense counsel." Instead, ineffective-assistance is measured by an objective standard, with a strong presumption that counsel's performance was effective, *Strickland v. Washington*, 466 U.S. 668, 688, 690 (1984), and decisions that appear to have been made pursuant to a viable strategy will not be second-guessed by a judge playing the role of "Monday-morning quarter-back." *Smith v. Gaetz*, 565 F.3d 346, 354 (7th Cir. 2009). It is in this light that Mr. Hale's assertion regarding the court's failure to hold a hearing to evaluate his counsel's decisions must be reviewed. That alone is essentially enough to reject Mr. Hale's claim of error, based on the performance-prong alone of ineffective assistance analysis.[3] The court will briefly elaborate on Mr. Hale's specific assertions,

---

[2] Throughout this order, the court cites to the record using the docket number and pagination from the banner placed on the document by the CM/ECF system.

[3] Mr. Hale's defense counsel succeeded in obtaining a jury acquittal on the charge that he had solicited Jon Fox to murder Judge Lefkow: a charge which, in the court's view, the evidence of Hale's guilt was very strong. "There is a strong presumption for finding counsel effective, and Banks bears the burden of proving otherwise. In cases such as this, where counsel has succeeded in having his client acquitted of at least one of the charges brought, the presumption is likely to be even more difficult to rebut."

however, explaining why counsel's actions were objectively reasonable, and commenting on the prejudice prong as well.

First, Mr. Hale asserts that the court erred by failing to hold a hearing to determine whether, had trial counsel interviewed government witness James Burnett prior to trial, counsel would have learned that Burnett's testimony was coerced. A claim that failure to interview a witness is ineffective assistance requires a § 2255 movant to demonstrate specifically what information, helpful to the defense, the interview would have uncovered. *See United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011). Hale believes he has done this by alleging that an interview would have revealed that the government had coerced Burnett into giving false testimony at trial. This is based on speculation piled upon speculation, however, and not upon an evidentiary proffer which requires a hearing.

First, it assumes that Burnett would have voluntarily revealed government coercion, at the very time he was being coerced (and which he did not reveal under strong cross-examination at trial). Moreover, there is no viable showing of any such coercion. An affidavit from Burnett, stating that his testimony against Mr. Hale resulted from governmental coercion is required at a minimum. *See Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997). Instead, all that Mr. Hale offers is his brother's affidavit recounting having run into Burnett in a bar following the trial, at which time Burnett tearfully explained that he testified against Mr. Hale because of government coercion.

---

*United States v. Banks,* 405 F.3d 559, 568 (7th Cir. 2005) (citation omitted).

4

The hearsay nature of Burnett's alleged statement makes Mr. Hale's brother's affidavit of no evidentiary value on the issue.[4] Even assuming Burnett did make the statement, under the circumstances—a teary, bar-room apology—it is not a post-trial recantation that rings with credibility. Without an affidavit from Burnett (which has not even been supplied in support of Mr. Hale's RULE 59(e) motion), the court did not err re was no reason to hold a hearing.

Second, Mr. Hale argues that the court should have held an evidentiary hearing to find out if the reason that his defense attorneys didn't call any witnesses was because they wanted to "get the trial over with in order to begin work on the 'new big case' and because they did not feel that Mr. Hale's family had paid them enough money," as Mr. Hale alleges they told him in his affidavit. (DE # 52 at 3-4.) Although this assertion is facially implausible—if true, why would his defense attorneys reveal this to him, and why would his defense team, headed by one of the more prominent criminal defense attorneys in Chicago, want to give short-shrift to a trial which at the time was receiving extensive media coverage to work on some other "big case"—implausibility is not the reason the assertion does not require a hearing. A hearing is not required because the subjective reason defense counsel didn't call witnesses is unimportant, unless Mr. Hale can identify witnesses whose testimony would have made a difference to the outcome.

---

[4] "As this court has noted before, " '[i]t is the rule of this [c]ourt that in order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions.' " *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002) (citations omitted).

This is not to say that Mr. Hale has failed to name witnesses and proffer their testimony, only that the court believes its explanation when denying his § 2255 motion why those witnesses would have made no difference was more than adequate.[5]

Next, Mr. Hale argues that an evidentiary hearing must be held to determine whether or not his defense counsel "actually *did* believe" (DE # 52 at 4) that the word "information" in a recorded conversation between Hale and informant Evola meant only one address (not multiple addresses, which counsel allegedly would have understood had he prepared for trial more extensively). The court has explained at length, both in rejecting post-trial motions and Mr. Hale's § 2255 motion, why this argument is meritless, to such an extent that saying more now is redundant. Nevertheless, reiterating and in addition to everything said previously, an evidentiary hearing is unnecessary because: 1) the record shows that counsel did understand that the word meant multiple addresses;[6] and 2) counsel's choice to present a defense based on a view that a jury would understand the conversation at issue to be focused on Judge

---

[5] It should also be noted that Mr. Hale's attorney argued to the jury during closing that the government's case was so preposterous that a defense case was unnecessary, evidence that this was a strategic decision intended to emphasize the unreliability and bias of the government's witnesses, and the entrapment defense presented.

[6] Defense counsel's cross-exam of Evola illustrates: "Now, that e-mail I just showed you, December 4, that was an e-mail where he's [Hale] asking for *addresses*, correct?" (Trial transcript, Vol. 9 at 76) (emphasis added.) "And it says in there [December 5 e-mail] that he's [Hale] in the process of getting *the people's home addresses in there*, correct?" (Id. at 79) (emphasis added.)

Lefkow's address was objectively reasonable, thus defense counsel's subjective understanding (although shown by his cross-examination of Evola) is irrelevant. *See Ebert v. Gaetz*, 610 F.3d 404, 415 (7th Cir. 2010) (noting that even defense counsel's own admission that he was ineffective is entitled to no weight, because ineffective assistance is judged by objective standard).

Fourth, Mr. Hale argues that a hearing is necessary to determine whether his defense counsel in fact secured his assent to be absent from portions of individual voir dire of prospective jurors. The court addressed this issue at length in its order denying Mr. Hale's 2255 motion, explaining, among a number of other reasons including lack of prejudice, that Mr. Hale did not even clearly assert that he had not consented to the voir dire method used, and if that should be presumed to be his contention, it was an after-the-fact contradiction of the record unworthy of credence. *Cf. United States v. Boyd*, 86 F.3d 719, 722-23 (7th Cir. 1996) (post-trial objection to lawyer's peremptory challenge of juror simply "too facile"). Mr. Hale has not explained in his present motion why the court's prior reasoning was legally flawed, and the court therefore sees no reason to discuss this issue further.

Fifth, Mr. Hale argues that a hearing is necessary to determine whether his defense counsel misrepresented to the court that Mr. Hale only wished to testify as to certain counts. Given the court's holding in its order denying the § 2255 motion that Mr. Hale, who is an attorney, executed a valid written waiver of his right to testify, which the court questioned him about in open court, this contention is meritless.

7

Sixth, Mr. Hale argues a hearing is required to determine whether his attorneys' "personal contempt for Mr. Hale negatively affected their legal judgment concerning jury selection, choice of defense, investigation, and putting on a case." Again, ineffective assistance is measured by the objective standard set out in *Strickland*. Without showing how his attorneys' performance failed to meet this standard and caused him prejudice, their personal feelings towards Mr. Hale are irrelevant, *United States v. Mutuc*, 349 F.3d 930, 934 (7th Cir. 2003), making a hearing unnecessary.

Seventh, Mr. Hale argues a hearing is necessary to determine whether his attorney discriminated against potential white jurors on purely racial grounds. Just as the court previously stated when denying his § 2255 motion, Mr. Hale has simply shown nothing suggesting that white jurors were discriminated against, except speculation based on the use of peremptory challenges against white, but not black, venire members.[7] He argues now that the support the court demands on this issue can only come from the testimony of defense counsel and Mr. Hale himself at an evidentiary hearing, but that would be a fishing expedition. A hearing is not required based on nothing more than speculation. *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002).

---

[7] Without more explanation, Mr. Hale is essentially arguing that peremptory challenges should have been used against blacks simply because of their race. He personally made a similar argument to the court, during jury selection. (Trial Tr. Vol. 3 at 24-27.)

Eighth, Mr. Hale argues that the court erred by not holding an evidentiary hearing to determine if "counsel's concern about opening up Mr. Hale to cross-examination was in fact greatly exaggerated, the concern stemming largely from counsel's personal contempt for Mr. Hale rather than based on reasoned legal judgment." (DE # 52 at 5). For the reasons already given—Mr. Hale validly waived his right to testify, and his attorneys' personal regard (or lack thereof) for him is irrelevant—this contention is meritless. In addition, his attorney requested a bifurcation of certain counts precisely so that Mr. Hale could testify, which request the court denied. That request, along with counsels' explanation for not having Mr. Hale testify, shows that a strategic decision was made which was objectively reasonable, and which will not be second-guessed. Thus, there is no need for an evidentiary hearing on this issue.

### B. Hale's contention that he knew Evola was an informant

As a separate argument, Hale maintains that his contention that he knew Evola was a government informant has been supported by substantial evidence. He argues that a hearing should have been held for him to give a detailed explanation of that belief,[8] and to explore why his defense counsel did not utilize that belief to show the

---

[8] Mr. Hale has provided a lengthy and detailed declaration (DE # 52-2) explaining all of the reasons he suspected that Evola was a government informant, which he believes justifies an evidentiary hearing. However, he could have testified to all of this information at trial, and the short answer to why this is not fodder for an evidentiary hearing is that Mr. Hale chose to waive his right to testify.

jury that Hale did not have criminal intent when meeting with Evola, but instead play-acted with Evola knowing that no harm would come to Judge Lefkow.

In this form, this argument is to some extent—perhaps largely—a new argument, and RULE 59(e) motions cannot be used to advance new arguments that could have been made previously. *County of McHenry v. Ins. Co. of the West,* 438 F.3d 813, 818 (7th Cir. 2006). Hale's original argument went only to his counsel's failure to call witnesses Robertazzo and Peterson, who would have testified that Mr. Hale had told them he suspected Evola was an informant. It bears noting immediately, as the court pointed out when denying the § 2255 motion, Robertazzo's affidavit didn't even say that: she states only that she had told Mr. Hale that she suspected that Evola was an informant.

Taking the argument as it is presented, however, by assuming Mr. Hale is merely clarifying his previous argument, his alleged belief that Evola was an informant could have come in at trial only through his own testimony, perhaps corroborated by the evidence provided in Mr. Hale's supplemental filing, and that of Robertazzo and Petersen (except as noted, Robertazzo's affidavit doesn't say that Mr. Hale told her that). The court had already held that Mr. Hale's waiver of his right to testify was valid, so there would have been no evidence from him, leaving only Peterson to testify that Mr. Hale had told him that.

But if the court puts all that aside, and assumes that Mr. Hale would have testified that he thought Evola was an informant, and that Peterson and Robertazzo would have corroborated that testimony, defense counsel would have had to weigh the

10

value of that evidence, intrinsically and in light of the other evidence. First, Peterson and Robertazzo were both sympathizers of Mr. Hale and of his white supremacist philosophy, and this bias would have discounted their credibility. Second, Mr. Hale's testimony on the issue would have been obviously self-serving, particularly in light of evidence that: 1) the chain of events leading to the charges against Mr. Hale had started with an e-mail he sent to a number of his followers—not just Evola—mentioning that a state of war existed against Judge Lefkow and others, and then quoting his church's "bible" teaching that they "obviously are the criminals, and we can then treat them like the criminal dogs they are and take the law into our own hands. . . . We must then meet force with force and open warfare exists. It will then be open season on all Jews;" 2) that then Mr. Hale sent an e-mail only to Evola, seeking Judge Lefkow's home address; and 3) testimony from a former close associate of Mr. Hale's, Jon Fox, that after Mr. Hale was charged he wrote a letter to Fox asking him to "remember" that he (Hale) had thought Evola was an informant. Fox testified that Hale had never said that, and he therefore thought Hale was asking him to lie about the issue.

This is where Mr. Hale's supplemental filing comes in, which he contends corroborates his proposed testimony that he knew, beginning in January, 2001, that Evola was an informer. The filing (DE # 66-1) is a transcript of a videotaped conversation among Hale, Evola and John Schlismann that occurred on December 3, 2000. In it, Hale explains that he knows an individual named Eric McGowan is an informant, posits that the reason McGowan didn't propose committing crimes might be

11

because "he knew that that would be a real big red flag," (DE 66-1 at 5 lines 16-18), and explains that there were good reasons to keep McGowan active in Mr. Hale's organization, without letting McGowan know that Hale was wise to him.

Mr. Hale has provided a verified declaration explaining that he first suspected Evola was an informant in January, 2001, when Evola suddenly proposed violence be committed against a former Hale associate, Ken Dippold, which he viewed as a "red flag." (DE # 52-2 at 2, ¶ 4.) Thus, the conversation recorded one month earlier, in which he expressed the same "red flag" theory about McGowan, and explained why keeping McGowan active in the organization, would corroborate his explanation that he knew Evola was an informant and had good reasons to keep an unknowing Evola within his confidence.

There is an obvious reason, however, why defense counsel would not have found this evidence as compelling as Hale portrays it now. According to Hale, he first suspected Evola when Evola spontaneously proposed violence against Dippold, in January 2001; but in the very recording at issue, from December 3, 2000, *Evola proposes violence against Dippold*. Evola asks: "What are we gonna do about this, this uh, traitor?" (DE # 66-1 at 1, line 1.) After Mr. Hale explains that while he wishes he could snap his fingers and "the bastard would drop dead hideously right now," (DE # 66-1 at 1, line 11), there are reasons instead to be legal, peaceful and follow the rules, Evola proclaims: "I kinda think that he should be tooken care of though." (DE # 66-1 at 2, line 11.) It is clear that Mr. Hale understands Evola to mean violence, because he responds: "I

wouldn't lose any damn sleep over it, but you know my policy has to be well, you know, we're legal and we're peaceful and that's the only way we can survive right now, you know." (DE # 66-1 at 2, lines 12-15.) Later in the conversation, Hale explains his "red flag" theory about McGowan. Therefore, Mr. Hale had a reason to suspect Evola earlier than he acknowledges, and it would be odd for him to proceed to explain to Evola how an informer might tip himself off, after Evola had done just that. More precisely, it is reasonable to determine a jury would view the conversation in this way, and so decide not use it.[9]

In short, defense counsel—and Mr. Hale himself—had to weigh weak evidence of Hale's supposed belief that Evola was an informant against the risks inherent in Mr. Hale testifying in his own defense. Choosing not to use the evidence was not an unreasonable decision. Moreover, all of this evidence would have been in service to Mr. Hale's now-proposed alternative defense, and the court has explained extensively why it wasn't objectively unreasonable to choose to use an entrapment defense instead. As a result, an evidentiary hearing now to delve into the details of the truth or falsity of whether Mr. Hale believed that Evola was an informant is not necessary.

---

[9] Mr. Hale also argues that portions of the conversation showing that he believed in peaceful, legal action should have been played for the jury. As he admits, however (DE # 66 at 1, n. 1), portions of the conversation showing just that (DE # 66-1 at 1, lines 2-6; at 2, lines 13-16) were played to the jury. Attorneys are not ineffective for not using cumulative evidence. *United States v. Jackson*, 935 F.2d 832, 845-46 (7th Cir. 1991).

## II. Whether the court erred by applying the wrong legal standard

Mr. Hale's second argument is that the court erred by applying the wrong legal standard in evaluating his ineffective assistance claim, improperly treating it as a motion for a judgment of acquittal, by:

> holding that, anytime a reasonable *jury* could have found *guilt*, Mr. Hale's counsel also *ipso facto* acted *reasonably*. This is of course not the issue. Whether a reasonable jury could still have found Mr. Hale guilty *without* the alleged errors of counsel is not relevant as to whether the errors of the counsel were themselves *unreasonable* (and thus deficient) and undermined confidence in the outcome (and thus prejudicial).

(DE # 52 at 7.) He then quotes a number of passages from the court's opinion and order to support this assertion, for example: "Viewing the evidence most favorably to the government, however, a reasonable jury could, and did, find that Hale inveigled Evola." (DE # 52 at 7 (Opinion and Order at 70, n. 41 (DE # 50 at 70, n. 41))) Mr. Hale then concludes:

> The issue is not what a "reasonable view" of the evidence might be nor what a reasonable jury *could* have found "[v]iewing the evidence most favorable to the government" but rather whether *counsel* were unreasonable in failing to challenge key elements of the government's case. . . . Simply put, the government is not supposed to receive the benefit of any evidentiary inferences against Mr. Hale pursuant to the resolution of a § 2255 motion. By allowing the standard for a motion for judgment of acquittal to repeatedly seep into its reasoning, the Court subjected Mr. Hale to a much higher burden than the law for ineffective assistance provides, namely forcing him to prove that *no* jury would have seen matters other than as he claims, which is an impossible standard on its face.

(DE # 52 at 9.)

14

As an initial matter, although the court agrees with Mr. Hale that the standard applicable to an ineffective assistance of counsel claim (brought in a § 2255 motion or elsewhere) is different than the standard applicable to a motion for a judgment of acquittal, the court does not agree with Mr. Hale's implied assertion that obtaining relief via § 2255 presents a movant with a lesser burden than does a motion for a judgment of acquittal. "Because habeas relief is an extraordinary remedy, the standards that a §2255 petitioner must meet are necessarily more stringent than those required of a criminal complainant on direct review, or a plaintiff in a civil suit." *Paters v. United States*, 159 F.3d 1043, 1060 (7th Cir. 1998) (Coffey, J., concurring and dissenting). A motion for a judgment of acquittal, which may be made even before the jury returns its verdict, is not directed at a final judgment, while a motion under § 2255 is a collateral attack on a final judgment. The interest in the finality of judgments limits the scope of collateral review, *Ryan v. United States*, 645 F.3d 913, 915 (7th Cir. 2011), and when the claim is based on ineffective assistance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690.

Nevertheless, and no matter where the two motions should be placed on the continuum of stringency in the standard for relief, the court does not believe that it erred by applying the wrong standard. As the court clearly stated in its order denying Mr. Hale's § 2255 motion, the standard for a § 2255 motion was established by *Strickland*, and requires the movant to show that his attorney's performance fell below

15

an objective standard of reasonableness (that is, outside the wide range of professional competence), and prejudice, that is, a reasonable probability of a different outcome had the attorney's errors not occurred. This is the standard the court applied.

As the government argues in its response to Mr. Hale's motion, in assessing counsel's performance under that standard, the court used the language Mr. Hale objects to either: 1) in commentary which has nothing to do with counsel's performance under that standard; or 2) in assessing the reasonableness of counsel's strategic choices in light of the way the evidence might be viewed, as part of the application of the appropriate standard. As an example of the first of these two uses, the comment quoted above ("[v]iewing the evidence most favorably to the government, however, a reasonable jury could, and did, find that Hale inveigled Evola") was made in a footnote observing that the alternative defense theory proposed by Mr. Hale in his § 2255 motion would have required the jury to find that Evola proposed the scheme to Hale, and that same theory was at the heart of the entrapment defense which was used, and which the jury rejected. Another example is on page 13 (DE # 50 at 13) of the order: "[T]he court has already painstakingly explained why, when the evidence is viewed as a whole, the most plausible interpretation of the initial conversation between Hale and Evola is that Hale understood Evola to be referring to the "extermination" of Judge Lefkow." This comment was directed at one of the evidentiary arguments underpinning Mr. Hale's alternative defense theory, and was intended to incorporate the court's prior explanations of the reasons why that interpretation was not plausible.

16

An example of the second use of such comments, on page 14 (DE # 50 at 14) of the order the court stated: "As has been explained previously and again herein, while that [Hale didn't need to correct Evola] might be a reasonable view of the evidence , it is not the only reasonable view, and is one the jury rejected." The context of this comment is as follows. In his § 2255 motion, Mr. Hale argued he thought that Evola was proposing the murder of James Amend, but then Evola suddenly switched the plan to Judge Lefkow. In his reply to the government's response questioning why Hale didn't object to the change in plans, Hale argued that he didn't need to correct Evola, because he had never asked Evola to do anything in the first place.

The court's comment that "while that might be a reasonable view of the evidence, it is not the only reasonable view" went to the court's explanation of why it was a reasonable strategic decision, based on the evidence, for Mr. Hale's counsel to proceed on the theory that Hale had always understood Evola to be discussing Judge Lefkow, rather than on the alternative defense proposed by Hale in his § 2255 motion (which depended on interpreting the first conversation between Evola and Hale as having Hale understanding Evola to be talking about attorney Amend). It should go without saying that the only way to determine whether an attorney's choices are objectively reasonable is to interpret those choices in light of the evidence.

The above discussion refutes three of the ten examples provided by Mr. Hale of the court supposedly applying the wrong standard. Rather than belaboring the point further by going through the remaining seven, the court reiterates that each of them, in

context, is understood in a similar fashion, and that the court applied the correct standard in analyzing Mr. Hale's ineffective assistance claim.

### III. Whether the court misunderstood argument concerning attorney Amend

Summarizing as briefly as is possible, in his § 2255 motion Mr. Hale argued that his attorney was ineffective for not using Hale's "best" defense, which was, he asserts, that he understood Evola to be proposing the murder of lawyer Amend. When he realized that Evola was changing the target to Judge Lefkow, he rejected the plan. The government responded that this would have been a risky defense choice, as it required conceding that Hale had a murderous intent, but directed at someone other than Judge Lefkow. In his reply, Mr. Hale argued that his alternative defense would not have required that concession. In denying Mr. Hale's § 2255 motion, the court commented that it did not understand "the nuances" of how avoiding that concession would have been possible.

In his RULE 59(e) motion, Mr. Hale elaborates. The government responds that this is simply a re-hashing of Hale's original argument, which the court should not even consider, but does respond to the merits. The court will briefly do the same.

Mr. Hale's elaboration, in a nutshell, is that his defense counsel could have attempted to show that when Evola mentioned "exterminating" a "Jew rat" in a conversation on December 5, 2002, Hale understood Evola to mean attorney Amend, and not Judge Lefkow. This could have been done without conceding that Hale was

soliciting Evola to murder Amend, or agreeing with Evola in any way. This would be possible because of the evidence showing that Mr. Hale knew Evola was an informant.

The argument made in Mr. Hale's § 2255 motion was that he thought, on December 5, 2002, that Evola was announcing a plan to murder lawyer Amend (Mr. Hale says "good" after Evola said "consider it done"), but then "categorically rejected" Evola's plan when he understood that Evola meant Judge Lefkow. The court still fails to see how that argument makes sense, or has any impact, were Mr. Hale not actually agreeing with the Amend plan. Beyond that, even if the court accepts Mr. Hale's argument now that it would not have been logically inconsistent to argue that he knew the Amend plan was phony so had no need to reject it, but then categorically rejected the plan when it switched to Judge Lefkow, this still does not amount to a showing that the alternative defense, entrapment, chosen by his counsel, was objectively unreasonable. The court has examined Mr. Hale's proposed alternative defense argument at length, and explained why, based on all the evidence available, the defense strategy that was actually used was reasonable, if not better than Mr. Hale's "hindsight" defense. The court need not repeat that discussion here, anymore than it already has, but instead only states that it does not believe that Mr. Hale's RULE 59 motion has shown the court erred in this regard.

**IV. Whether issue regarding absence from voir dire was waived**

Mr. Hale argues that it is not clear from the record that his absence from portions of voir dire was involuntary, and so this issue could not have been raised on direct

appeal. Thus, he has not waived the issue and may raise it in this § 2255 proceeding. The government's response is that this is a new argument that cannot be made under the guise of a RULE 59 motion; and that it rests on the substance of its prior response to the issue as raised in Mr. Hale's § 2255 motion.

The government is correct that Mr. Hale is attempting to amend his § 2255 motion and make a new argument. In his initial motion he attempted to avoid waiver by arguing that he is actually, factually innocent; that he had cause for not raising the argument on appeal, because voir dire transcripts were not available to him; and that in any event, his absence is a structural error which can always be raised. He made these non-waiver arguments in support of his original argument *that the record was devoid of evidence showing that he, or his counsel, consented* to his absence from voir dire. (DE # 18 at 41). Thus, the issue Mr. Hale raised in his § 2255 motion could have been raised on direct appeal, and the court's discussion of waiver was adequate and will not be reconsidered under RULE 59(e).

## V. Whether transcript overlooked by court merits reconsideration

In his § 2255 motion Mr. Hale argued that his attorney was ineffective for not offering exculpatory evidence including a comment he had in Evola's presence that he wished Ben Smith had shot him (Hale) in the leg instead of going on a multi-state shooting spree targeting, and killing, several non-Caucasian individuals. (DE #18 at 25.) In rejecting this argument, the court noted that because Mr. Hale did not testify, the evidence would have had to come in through Evola, and nothing could have been done

20

if Evola denied that Hale made the remark. In his RULE 59(e) motion, Mr. Hale points

out that the court overlooked a transcript of conversation which Evola recorded,

containing the remark, which could have been used to confront Evola on the witness

stand.[10]

As the government argues in its response, the entire context of the remark makes

Mr. Hale's argument based on it almost ludicrous. In the conversation, Mr. Hale is

recounting that he told someone "with absolute sincerity and conviction" that he

wished Smith had shot him in the leg, and that he:

> [M]eant it actually. In a sense . . . you know, because I think it has hurt us
> in some ways plus he'd be alive if he had shot me in the leg. . . . [A]nd
> maybe I'd have my law license right now. There wouldn't be these
> lawsuits against us right now. . . . . And they nodded their heads, you
> know, and there was nothing else they could say but if I had said well,
> well, he shot a couple, you know, mud people, who cares? . . . You know
> they would definitely, definitely want to use that against me, say that I
> don't have good moral character, you know?

(DE # 8-4 at 69.) This is not a condemnation of the violent acts committed by Smith, it is

instead, just as the government states, a "pragmatic analysis of the consequences of

Smith's murderous spree." (DE # 58 at 12.) Considering the other evidence in this case

(including the portion of this conversation where Mr. Hale laments that it would have

been "held against him" if he had said that Smith shot "mud people, who cares") shows

---

[10] In his § 2255 motion Mr. Hale did not provide a specific cite to this information, leaving the court to ferret it out on its own. As is now clear, it appears at DE # 8-4, page 69, but as addendum # 3 to DE # 8 when viewing the docket text. This explains Mr. Hale's and the government disagreement in correctly identifying it. The confusion in numbering results from a glitch in the CM/ECF system which, the court believes, has been corrected in subsequent versions.

that there is no likelihood whatsoever that this evidence would have impacted the outcome of the trial. Although the court did in fact overlook the transcript previously, considering it now does not give the court pause or any reason to reconsider its prior ruling.

**CONCLUSION**

For the reasons above, Mr. Hale's motion pursuant to RULE 59(e) (DE # 52) is **DENIED**. The court reaffirms its decision (DE # 50) denying Mr. Hale's § 2255 motion, and denying him a certificate of appealability.

**SO ORDERED.**

Date: October 27, 2011

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT